William J. CURNOW, Administrator of the Estate of Martha M. McCoy, Deceased, Plaintiff,

v.

WEST VIEW PARK COMPANY, Defendant.

Civ. A. No. 61-615.

United States District Court
W. D. Pennsylvania.

Aug. 9, 1963.

Gustav W. Wilde, Louis M. Tarasi, Jr., Robert M. Brown, Pittsburgh, Pa., for plaintiff.

Herbert Jacobson, Harold Gondelman, Pittsburgh, Pa., for defendant.

DUMBAULD, District Judge.

This action was brought by an out-of-state administrator, appointed by the Register of Wills of Allegheny County, Pennsylvania, on behalf of the estate of and on behalf of the five children and husband of Martha M. McCoy, who met her death as the result of being struck by the collapse of an aerial rig in connection with an acrobatic act at an amusement park operated by defendant. The action was brought under the Pennsylvania Survival Act (20 P.S. §§ 320.601 and 320.603) and Wrongful Death Act (12 P.S. §§ 1601 and 1602). It is provided in 12 P.S. § 1601 that "Whenever death shall be occasioned by unlawful violence or negligence * * * the personal representatives may maintain an action for and recover damages for the death thus occasioned."

A duly appointed administrator would appear to fall within the category of "personal representatives". This interpretation is confirmed by the terms of Rules 2201 and 2202 Pa.R.C.P., 12 P.S. Appendix and Rule 17 F.R.Civ.P. It is conceded that the administrator may properly bring the survival action on behalf of the estate of the deceased.

But it is contended that there is a distinction between the status of the administrator under the Survival Act and under the Wrongful Death Act, where the proceeds are held for the benefit of the specifically enumerated relatives in the classification established by 12 P.S. § 1602. We are unable to comprehend or

perceive the force of the distinction thus asserted. A duly appointed administrator is acting in his same official capacity whether the proceeds collected from a law suit enure to the benefit of the decedent's heirs under intestate laws, or creditors of the estate, or beneficiaries specified in an annexed will (in the case of an administrator *cum testamento annexo*), or, as here, to the benefit of a specifically designated category of statutory beneficiaries.

Consequently, much as we would rejoice to see the docket of the federal courts diminished by the elimination of collusive appointments of foreign administrators (or even, as has often been urged, by the elimination of diversity jurisdiction entirely by Congressional action),[1] we are unable to see why this case does not fall within the principle enounced in Corabi v. Auto Racing, Inc., 264 F. 2d 784, 788, 75 A.L.R.2d 711 (C.A. 3, 1959). See also Fallat v. Gouran, 220 F.2d 325, 326 (C.A. 3, 1955). This principle does not appear to be weakened by the doubtful status of a guardian *ad litem* as discussed in Berkowitz v. Philadelphia Chewing Gum Corp., 303 F.2d 585, 587–588 (C.A. 3, 1962). Accordingly, we feel that it is clear that this Court has diversity jurisdiction and that, there being no jurisdictional defect, Rule 50 (b) F.R.Civ.P. forecloses the granting of defendant's motion for judgment *non obstante veredicto* by reason of failure to make a motion for a directed verdict at the close of all the evidence.

■ At the trial defendant conceded liability and the issue of damages only was considered by the jury.[2] A verdict was returned in the amount of $10,000.00 in the Survival Act action and of $90,-000.00 in the Wrongful Death Act action.

Defendant now contends that the award of $10,000.00 should be set aside or reduced upon the ground that there was no evidence of conscious pain or suffering endured by plaintiff after the accident and before her death. However, the testimony of Father Lawrence O'Connell, a Roman Catholic priest who administered the last rites to decedent was sufficient to sustain the jury's finding. This testimony reads as follows:

"Q At the time that you saw her, what was her condition?

"A She had a severe open gash on the left side of her head. She was bleeding profusely from the mouth and ears and from this wound in her head. And, her one eye was practically closed.

"Q When you found her in this state, Father, what did you then do?

"A My first administration was, I said, 'Martha, this is Father O'Connell. You have met with a very serious accident, and are very seriously hurt.'

"Q Did she make any reply?

"A Well, I began with an Act of Faith.

"MR. JACOBSON: No, Father. The question was, Did she make any reply.

"THE WITNESS: She did.

"BY MR. WILDE:

"Q All right. Will you tell what transpired on this particular occasion between you and Mrs. McCoy?

"A I kneeled down beside her and I whispered an Act of Faith,

---

1. According to Justice Robert H. Jackson, The Supreme Court in the American System of Government, 37 (1955), "the greatest contribution that Congress could make to the orderly administration of justice in the United States would be to abolish the jurisdiction of the federal courts which is based solely on the ground that the litigants are citizens of different states." See also Natl. Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 622, 651, 69 S.Ct. 1173, 93 L. Ed. 1556 (1949).

2. We feel sure that this concession was motivated not so much by a public-spirited desire to expedite trial of the case (which lasted for three days) as by strategical considerations and the desire to exclude the "gory details" of the accident from the jury's attention.

which is a procedure, an Act of Faith, Hope, and Contrition. And, she tried to—well, she formed some of these words, 'My God, I love you. My God, I am sorry for all my sins.' and then I said 'I am going to anoint you.' And, in the meantime, Mr. Clancey brought the oils from my car. I began to anoint her and while the anointing was taking place—and, in anointing, we anoint the five senses of sight, smell, ears, mouth and hands—her one hand was lying on the ground, palm down. And, as I came to anoint her, after I finished anointing her lips, she turned her palm over for me to anoint her hand. And then, after I finished anointing her, I said, 'Martha, you are prepared now. Try to offer your pain and suffering in union with the suffering of our Divine Savior.' And then I didn't hear anything. She didn't attempt to say anything further after that until we got to the hospital." (Tr. 35–36).

These rites were administered while the decedent was lying on the ground at the amusement park. Subsequently at the hospital Father O'Connell testified:

"I said: 'Martha, I am Father O'Connell. Do you realize that I am here? If you do, let me know by squeezing my hand.' And, she squeezed my hand. And then I began to pray." (Tr. 37).

Turning now to defendant's motion for a new trial, the first issue raised is regarding the news item which appeared in the Pittsburgh Press on May 2, 1963, concerning the case. In the course of this article mention was made of the fact that plaintiff's action was brought to recover $702,591.00. It is not contended that plaintiff's counsel inspired publication of this article. On the contrary it appears that plaintiff's counsel when approached by a reporter warned the reporter not to publish the amount of damages claimed. It seems likely that the offensive article was based upon a prior article in the newspaper's "morgue" which had been published at the time the complaint was filed. The rules of this Court do not at the present time provide that the complaint, with respect to the *ad damnum* clause, shall merely specify that damages in excess of $10,000.00 are claimed. Such a rule would perhaps be desirable. The amount of damages claimed can therefore readily become a matter of public notice in the Clerk's office.

The next morning, when this article was brought to the Court's attention, each of the jurors was separately questioned by the Court and by counsel for both sides. After interrogation each juror returned to another place, so that the jurors remaining to be questioned had no knowledge concerning what the matter under discussion was until it was their turn to be examined.

As a result of this inquiry, the Court was satisfied that the jurors were fairminded and intelligent individuals who could and would disregard the newspaper article. We remain of the view that this is a proper case for application of the rule set forth in Burch v. Reading Company, 240 F.2d 574, 577 (C.A. 3, 1957), where it was said that jurors are assumed to be intelligent and conscientious and not mere automata that respond mechanically to every impression they receive.

It is clear that the newspaper article was regarded by those jurors who did see it or discuss it in the light of their ordinary newspaper reading and not as a part of their work as jurors. The article was not read or considered by all of the jurors, during their deliberations, but was simply read or glanced at by some of the jurors during their leisure time during a recess or read by them at home in accordance with their daily routine of reading a newspaper.

Thus the situation is different here from that in Vaughan v. Magee, 218 F. 630, 631 (C.C.A. 3, 1914) and McKibben v. Phila. & Reading Ry. Co., 251 F. 577, 578 (C.C.A. 3, 1918), where impropriety

occurred within the sphere of the judicial process itself. Other cases cited by defendant are likewise distinguishable on their facts. Undoubtedly, with the pervasive impact of modern mass media, it is possible for situations to occur where a fair trial can not be had. Each case must be adjudicated on the basis of its own facts, and a conclusion reached with respect to whether or not a fair trial was had. Beck v. Washington, 369 U.S. 541, 557, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962). In the case at bar we think no prejudice to defendant occurred.

Of particular significance in confirming this conclusion is the fact that in the next case before the trial judge six of the same jurors were in the box who sat in the case at bar. A defense verdict was there rendered in a flimsy FELA case against a railroad corporation. These circumstances show that the jurors whose trustworthiness defendant questions were capable of exercising judicious discrimination and good judgment. The Court feels that they were right both times. The experience is one which confirms our faith that the jury system still operates in practice in accordance with the ideals and principles which are embodied in that venerated institution of our common law heritage.

Moreover, the Court expressly and emphatically charged that:

"It is for you to determine what the facts are and to base your verdict upon the evidence which you have heard here in the courtroom and in accordance with the instructions of the Court regarding the law.

"I make that instruction particularly emphatic in this case because of the fact that it has been brought to the attention of the Court that there has appeared an article in a Pittsburgh newspaper concerning the case, and that some of you might have seen and glanced at or read in full this particular article. But, I am confident that all of you, being individuals of intelligence and conscientious in the performance of your duties as jurors, will not be

derelict to your oaths that you have taken, and that you will therefore lay aside and pay no attention whatever to, and be completely uninfluenced by, anything that you may have read in newspapers or heard on television or in gossip in the corridors or on the streets or anything whatsoever except the evidence that has been presented here in the courtroom in the course of the trial." (Tr. 296–97).

Again, at the close of the case the Court repeated "I did charge you that you should not base your verdict upon anything except the evidence that has been heard here in the courtroom. Specifically, to lay aside anything that you may have seen in the newspapers which are often inaccurate and unreliable in ordinary life, and in any event are not evidence in a case in court and are not to be considered to any extent whatever by the jury." (Tr. 323).

Defendant next contends that there was insufficient evidence from which the jury could determine the cost of maintenance of the decedent. It is conceded that the Court in its charge correctly instructed that:

"Also, in computing the value of the services, you must deduct the cost that it would have taken to maintain her during the time that she was performing such services. In other words, her husband is liable to support her and to pay for food and other expenses of her maintenance. So, of course, when you are computing the period after her death when expenses for maintenance would no longer have to be paid, you must deduct the cost of her maintenance from the monetary value of the services, of which the husband or children are being deprived. And then you reduce the sum to its present worth." (Tr. 309).

It is true that there is no evidence showing in terms of dollars the cost of maintenance of the decedent of which the husband would be relieved by the

death of the decedent, but there was abundant evidence regarding the wife's age, health, activities, characteristics, and habits. We believe that this was sufficient to enable the jury to carry out in proper fashion its usual functions in accordance with the instructions given by the Court. Kowtko v. Delaware & H. R. R. Corp., 131 F.Supp. 95, 103, 105 (M.D.Pa.1955); Jones v. Friesel, 207 F.Supp. 925, 927 (W.D.Pa.1962).

■ Defendant next argues certain alleged errors in the charge of the Court. First, it is said it was improper to quote the colorful language used by Justice Musmanno in Spangler v. Helm's New York-Pittsburgh Motor Express, 396 Pa. 482, 484–485, 153 A.2d 490 (1959). In the course of the quotation (appearing at Tr. 307–309) the Court made plain that the allowable items of services were those performed by Mrs. McCoy, and that not all of the items performed by Mrs. Spangler would be applicable to the case at bar. After reading that Mrs. Spangler "did the household work; she washed, ironed, cooked, and sewed", the Court interpolated the following:

"And very likely, these same items would apply to the case that you are considering, if you find from the evidence that Mrs. McCoy did perform these things. Of course, what I am reading from is the opinion of the court in another case involving a Mrs. Spangler. She did all the housecleaning, made some of the children's clothing, helped her husband paint the house and she put together draperies and rugs.

"As I say, these are what the evidence in the Spangler case showed that Mrs. Spangler did. And, of course, you are not to take this as evidence of what Mrs. McCoy did, but there has been evidence from which you can determine what services she did perform and what the value of those services is. And, it is your determination to make as to what services she did perform and what the money equivalent of those services would be. All these services

can be translated into pecuniary or money value, because one can presumably go into the labor market and find a housekeeper to perform those labors." (Tr. 307–308).

After a further quotation from the Musmanno opinion, the Court again emphasized: "As I have said, this relates to Mrs. Spangler and you are to consider from the testimony relating to Mrs. McCoy what were the services which Mrs. McCoy rendered, for which money compensation is to be paid." (Tr. 309). We are not convinced that any prejudicial impropriety resulted from the specific enumeration of the items for which, under Pennsylvania law, when supported by evidence in the case at bar, compensation was to be determined by the jury.

■ The decedent in this case left surviving her five young children of different ages. Some of them were in the courtroom during the trial, but were not called by the plaintiff as witnesses. At the conclusion of the Court's charge defendant requested an instruction in accordance with the rule, set forth e. g. in Haas v. Kasnot, 371 Pa. 580, 584–585, 92 A.2d 171 (1952), to the effect that the jury might infer that the evidence of these children would have been adverse to the plaintiff. Counsel for plaintiff then requested that the jury should also be instructed that if defendant wanted to call the children it could have done so. The Court granted both requests, in the following language:

"There is also a rule of law that could be applicable to this case, which I neglected to mention, and that is that where any witnesses or testimony which are in the control of one person are not produced, then the jury may, if it sees fit, draw the inference that the testimony of such persons would be adverse to, or would not be helpful to, the contentions of that party. In this case, it is the defendant's contention that this rule would apply with regard to the testimony of the McCoy children who were in court, but particu-

larly limited to those who are old enough to be proper witnesses.

"Since it is academic here and they were not called, I don't have to go into how old a child has to be to understand the meaning of an oath and so on in order to be acceptable as a witness in a court proceeding. But, with respect to those of the children who are of the age to be witnesses, it is contended by the defendant that that rule should apply here. It is, of course, for the jury to determine what inferences it chooses to draw from the failure of such witnesses to be called.

"On the other hand, it is the contention of the plaintiff that the rule would apply here, which is also a valid rule—and I so charge—that when the persons involved were present in the courtroom, the defendant could have called them as defense witnesses if it had been deemed desirable so .to do. So, again, what inferences are to be drawn from the failure to produce additional witnesses is a matter for your determination in accordance with all of the other rules of law that I have set forth. And, your verdict is to be based upon the entire record, including all the evidence before you." (Tr. 327–28).

This instruction did full justice to both parties impartially. In any event it would be absurd to suppose that the outcome of the case turned to any extent on the failure of either party to call several young children as witnesses concerning facts thoroughly covered by other testimony. In fact, if they had been called it might have been proper to exclude the testimony as cumulative or repetitious. We find no merit in this contention of defendant's.

■ We likewise see no substance in defendant's contention that it was error to permit the surviving husband to state that his finances did not permit hiring additional help besides those presently in his household. This circumstance was of relevance in connection with the testimony of Dr. Drisko, a family relations expert, concerning the nature and extent of the services necessary as a substitute for or equivalent of those which decedent mother would have provided for her family had she continued to live.

■ There is likewise no merit in defendant's point regarding possible remarriage of Mr. McCoy. If any party was prejudiced in this connection it was the plaintiff. The Court first permitted defendant to cross-examine Dr. Drisko with respect to the change in his plan of needed services that would result in the event Mr. McCoy should re-marry. Subsequently, the Court concluded that this line of questioning was improper, as under the law of Pennsylvania the rights of the ·parties entitled to damages in Wrongful Death and Survival actions are fixed at the time of death. Johns v. Baltimore & O. R. R. Co., 143 F.Supp. 15, 28 (W.D.Pa.1956). The Court thereupon instructed the jury as follows:

"Members of the jury, before we go any further, there is an irregularity here for which I am responsible, which I want to straighten up right now. That is with respect to the cross examination by Mr. Jacobson of the witness, Doctor Drisko. He asked a question which brought up the subject of remarriage of Mr. McCoy.

"Well, the subject is one which really should not be mentioned at all in the case, and you are therefore instructed to disregard it entirely. When the time comes for the charge, I will explain in full the rules for determining the measure of damages. But I will just say now that whatever the damages are as determined by the jury in accordance with the instructions of the Court, they are to be determined as of the date of the death of the decedent without regard to any speculative possibilities of any future remarriage of the husband.

"So, I think you are all intelligent people and can succeed in erasing

from your mind any subject that should not have been brought into the case. The plan that was presented by the witness, of course, can be discussed fully on cross examination. And, the theory upon which I permitted the question to be asked was that I thought it proper to bring out that this plan as prepared did not contemplate any remarriage. I understand that is the fact that the plan was prepared without any contemplation of such a contingency. It was permitted, of course, upon that feature and perhaps for that purpose it might have been proper to ask a question to develop the fact as to the exact scope of the plan prepared and the pre-suppositions upon which it is based.

"Just like if you are preparing a table of statistics of some kind, it is customary to show your sources where you got your information and how you treated the information for statistical purposes in order to determine the underlying data and the method of processing which has been used in preparing the exhibit. But, in this particular matter, I am now satisfied that it is a matter that really shouldn't be mentioned at all in the case, and therefore you are instructed to disregard that matter completely. So, I think with that explanation, we can now proceed with the remainder of the Doctor's testimony. An exception is granted to the defendant." (Tr. 208–210).

Defendant now contends that, since plaintiff called Dr. Drisko as an expert witness concerning plans for the future, cross-examination would be proper concerning the possibilities and effect of future re-marriage upon the expenditures called for by the plan. We find no merit in the contention that the type of proof used to establish the items of damages claimed by plaintiff should change the admittedly applicable rule that the damages are fixed at the time of death and that it is improper to indulge in specu-

lation concerning the re-marriage of the surviving spouse.

We also find no merit, under the circumstances of the case, in defendant's final contention that the verdicts are excessive. It will be noted that the Court charged (Tr. 305) regarding present worth that the legal rate of interest of 6% should be used, in accordance with the language of the Supreme Court of Pennsylvania in Gregorius v. Safeway Steel Scaffolds Co., 409 Pa. 578, 585, 187 A.2d 646 (1963).

Accordingly, defendant's motion for judgment *non obstante veredicto* and for a new trial should be denied.