## Jakofcich v. Triangle Engineering Company

*Rodger L. Mutzel,* for plaintiff.
*Charles H. Hinkson,* for defendants.

LIPPINCOTT, J., December 8, 1971.—Plaintiff's action sought damages under the Pennsylvania Wrongful Death Statute[1] and Survival Act[2], arising from a three-vehicle accident in which plaintiff's wife suffered fatal injuries. At trial, after verdict was directed in favor of the additional defendant, the jury found for plaintiff against the corporate defendant and its employe Begley in the amounts of $34,000 on the wrongful death action and $10,000 on the survival action. Plaintiff's motion for new trial is now before the court en banc for disposition.

Plaintiff's primary argument is that the trial judge erred in allowing cross-examination regarding the possibility or probability of plaintiff-husband's remarriage. In the course of the trial, Dr. Geraldine Gage, an expert in family economics, testified in support of plaintiff's wrongful death action as to the economic value of the services rendered by the deceased wife and mother

---

[1] Act of April 15, 1851, P. L. 669, sec. 19, 12 PS §1601.
[2] Act of April 18, 1949, P. L. 512, sec. 601, 20 PS §320.601.

computed on the basis of plaintiff-husband's life expectancy. On cross-examination, over plaintiff's objection, counsel for defendants was permitted to ask Dr. Gage a series of questions[3] which, plaintiff now con-

---

[3] The entire line of questioning to which plaintiff objects is as follows:

" 'Q. Tell me, Dr. Gage, do you have any charts which show the probability of remarriage of—

"MR. MUTZEL: Objection, Your Honor. I don't think that's relevant. I think it is prejudicial to this case and I move that that type of testimony be disqualified.

"MR. HINKSON: Your Honor, I think nothing could be more pertinent or more to the point. It is fundamental.

"THE COURT: May I have a side-bar conference?

(Discussion off the record at side bar.)

"THE COURT: The objection is overruled.

"Mr. Laska, please read the question back."

The question was read by the reporter, as follows:

" 'Q. Tell me, Dr. Gage, do you have any charts which show the probability of remarriage?'

"BY MR. HINKSON:

"Q. (continuing) . . . in circumstances similar to these, where the husband or the widow is Mr. Jakofcich's age.

"THE COURT: I think really the question should be as discussed at side bar: Did you consider the possibility of his remarrying in making these calculations. Is this a factor considered by you?

"THE WITNESS: It was not a factor considered by me.

"THE COURT: All right.

"BY MR. HINKSON:

"Q. Tell me, Dr. Gage, do you have any charts available to you which would show the percentage of individuals in circumstances—

"MR. MUTZEL: Objection, Your Honor, since the answer to that was, 'No.'

"THE COURT: The question is not whether they are available, Mr. Hinkson—

"MR. HINKSON: Then I am going to ask—

"THE COURT: —the question is whether she considered them.

"MR. HINKSON: I want to find if they are available and if she did consider them.

"MR. MUTZEL: She said she did not.—

"THE COURT: She has said she did not consider them. Now,

tends, raised the issue of the possibility or probability of the remarriage of plaintiff, then age 39, in mitigation of damages, and which were, therefore, highly prejudicial. We agree.

---

whether they are available—well, it may go to her credibility as to whether she should have, I don't know. I am allowing fairly wide latitude on cross-examination as to credibility; I overrule the objection.

"BY MR. HINKSON:

"Q. I would like to first establish whether or not such tables are available that would give you a figure which represents the percentage of men in Mr. Jakofcich's position who do remarry.

"A. I guess I would just disqualify myself and say that's a piece of social data and not a piece of economic data, and I would like to confine my expertness to economics.

"Q. Then let me ask you if doesn't this fact materially affect the economic data that you would compile?

"A. Based on the testimony I have, that's purely hypothetical.

"Q. But my question to you is if in essence, stripped of everything else—

"A. If he were now remarried I might have a different opinion.

"Q. I understand. But my question to you, stripped of everything else, was: Wouldn't it materially affect your opinion if Mr. Jakofcich were to remarry?

"THE COURT: As to what? As to the economic value of the services?

"MR. HINKSON: As to the economic value—as to ascertaining the figure of $215,000.

"THE COURT: Well, all right, if she can answer it, she may.

"THE WITNESS: You better repeat it.

"THE COURT: Read it back, please.

(the record was read by the reporter, as follows:

" 'Q. But my question to you is if in essence, stripped of everything else—

" 'A. If he were now remarried I might have a different opinion.

" 'Q. I understand. But my question to you, stripped of everything else, was: Wouldn't it materially affect your opinion if Mr. Jakofcich were to remarry?

" 'THE COURT: As to what? As to the economic value of the services?

In Haddigan v. Harkins, 441 F.2d 844 (3rd Cir., 1970), decided one week after verdict in this case, a death case very similar to the one at bar, plaintiff introduced expert testimony regarding the economic value of services rendered by a wife and mother, and the trial court refused to allow defendant to refer to plaintiff-husband's subsequent remarriage. On appeal, the circuit court affirmed, in a well-reasoned opinion, stating at page 851:

"The ruling was in accord with longstanding authority that in Pennsylvania rights of survivors in a wrongful death case are fixed at the moment of death, and remarriage cannot be considered in the assessment of damages" (citing numerous cases). See also Curnow v. West View Park Company, 220 F. Supp. 367 (W. D. Pa., 1963), reversed on appeal on other grounds, 337 F.2d 241 (3rd Cir., 1964).

Defendants do not quarrel with this statement of the law, but, instead, seek to distinguish the instant

---

" 'MR. HINKSON: As to the economic value—as to ascertaining the figure of $215,000.')

"A. I just don't think I would answer that question because—

"MR. HINKSON: All right.—

"BY THE COURT:

"Q. What you are saying is that your—

"A. There are other—all kinds of probabilities that would change.

"Q.—your figures are based on the assumption that he will not remarry—or that he does not remarry, is that it?

"A. To the extent that there is 32 years of his life left, and that she would have been there, and he is without her, that's right.

"Q. All right.

"BY MR. HINKSON:

"Q. So your answer is yes?

"A. I am saying I don't want to answer the question.

"Q. I see.

"A. Because all sorts of things are possible if all other things are possible, you see."

case on the ground that the questions asked Dr. Gage were not for the purpose of mitigating damages, but merely for the limited purpose of attacking her credibility by examining her sources of information. Defendants contend that such an inquiry is proper for this restricted purpose, and, in support thereof, cite several authorities from other jurisdictions.

Assuming, arguendo, that defendants may have properly questioned Dr. Gage as to whether she considered plaintiff's remarriage in her computations as a test of her credibility[4], it is clear from the record as set forth in the footnote that the inquiry extended far beyond that. Specifically, after Dr. Gage admitted that she had not considered the possibility of plaintiff's remarriage in her calculations, counsel for defendants proceeded to inquire as to whether charts were available to her showing the percentage of men in plaintiff's position who remarried, whether the possibility of remarriage would materially affect the economic data she compiled, and whether plaintiff's remarriage would materially affect her opinion as to the economic value of decedent's services.

The implication from this line of questioning is obvious enough, and becomes even more so in light of defense counsel's closing argument to the jury. This writer, who served as trial judge, clearly and specifically recalls that defense counsel argued strenuously and at considerable length to the jury that they should mitigate damages because of the distinct possibility of plaintiff's remarriage. No objection thereto was raised by counsel for plaintiff, apparently in view of the trial court's earlier ruling as to the propriety of the questions on cross-examination.

---

[4] But see Boudwin v. Yellow Cab Company, 410 Pa. 31, 188 A. 2d 259 (1963).

As is the custom, arguments of counsel were not recorded stenographically or made part of the record. Two months after trial, counsel for plaintiff filed a petition to "Comport Record with Occurrences at Trial," seeking to add thereto his version of defense counsel's closing argument to the jury. This petition was dismissed by order of the court en banc on the ground that there was no authority for such procedure. See Commonwealth v. Weber, 167 Pa. 153, 31 Atl. 481 (1895); Commonwealth v. Mika, 317 Pa. 487, 177 Atl. 3 (1935), and also note Commonwealth v. Allen, 443 Pa. 15, 276 A. 2d 539 (1971).

It is, therefore, with reluctance that we interject our recollection of the substance of defense counsel's remarks. However, in view of his present argument to the court en banc to the effect that his intention in cross-examining on plaintiff's possible remarriage was merely to test the witness's credibility and not to mitigate damages, we must go beyond the record and consider the remarks of counsel in order to determine whether plaintiff received a fair trial. See Dura Seal Products Company v. Carver, 181 Pa. Superior Ct. 377, 124 A. 2d 438 (1956).

Clearly, we are not dealing with harmless error. We must conclude that defendant's strong and effective closing argument to the jury based upon an improper interjection into the trial of the possible remarriage of plaintiff substantially prejudiced the jury in its consideration of the wrongful death claim. While the jury did award $34,000 for wrongful death, and this is not so shocking *per se* as to justify the award of a new trial, it is low enough to support our conclusion that the jury was influenced by the improper and prejudicial interrogation and argument.

We, therefore, must award a new trial generally in the interest of justice. In view of this conclusion, we

370

do not reach the other arguments raised by plaintiff in support of his motion.

ORDER

Now, December 8, 1971, plaintiff's motion for new trial against defendants, Triangle Engineering Company, Inc., and William F. Begley, is granted and a new trial is awarded.