Marcella K. SCHMITT and the Farmers National Bank of Webster City, Administrators of the Estates of Dorothy T. Schmitt and Theodore G. Schmitt, both Deceased, Appellees,

v.

JENKINS TRUCK LINES, INC., Violet H. Sorge, and Earlyn W. Quirren, Appellants.

No. 53082.

Supreme Court of Iowa.

Sept. 5, 1969.

McCracken & Carlin, Davenport, and David R. Hardy, Lane D. Bauer and Robert K. Waldo of Shook, Hardy, Ottman, Mitchell & Bacon, of Kansas City, Mo., for appellant Jenkins Truck Lines, Inc.

McDonald & McDonald, Davenport, and Austin, Grefe & Sidney, Des Moines, for appellants Violet H. Sorge and Earlyn W. Quirren.

Frank C. Byrd, Memphis, Tenn., and Whitley M. Hemingway, Webster City, for appellees.

MASON, Justice.

This appeal involves two law actions tried jointly to a jury in which plaintiffs as administrators of the estates of Dorothy T. and her husband Theodore G. Schmitt sought damages for the death of their decedents.

Defendants are Jenkins Truck Lines, Inc., lessee of a tractor-trailer unit, Violet H. Sorge, owner and lessor thereof and Earlyn W. Quirren, operator of the unit.

January 15, 1965, about 6 a. m. Quirren was. driving the tractor unit north on U. S. highway 69. Approximately 4¼ miles south of Blairsburg in Hamilton County a collision occurred between the unit and a southbound automobile being driven by Theodore G. Schmitt, in which his wife was a passenger. Decedents were killed outright as a result of the collision.

Basis of each action was Quirren's alleged negligence in operating the vehicle at a speed greater than was reasonable and proper under the existing conditions and failing to give half the traveled portion of the highway by turning to the right, keep a proper lookout and have his vehicle under control.

Defendants' motions for directed verdict and to withdraw all specifications of negligence made at the close of plaintiffs' evidence and renewed at the close of all evidence were overruled and the matter submitted to the jury on the four specifications of negligence. The jury returned verdicts against all defendants of $264,-162.74 for Dorothy's estate and $302,577.94 for Theodore's.

Defendants jointly filed motions for judgments notwithstanding the verdict and for new trial. Both were overruled and all defendants appeal.

I. The principal questions presented by the appeal are rulings on (1) defendants' motions for directed verdict and to withdraw specifications of negligence, (2) admissibility of evidence, (3) objections to certain instructions and failure to give certain requested instructions and (4) defendant's motion for judgment notwithstanding on all grounds urged therein, including excessiveness of the verdicts.

Defendants assign 14 errors relied on for reversal argued in nine divisions of their brief. The first six assignments give rise to the first question stated above, insufficiency of evidence to justify submission of specifications of negligence. Four attack rulings on evidence, two the court's instructions. The remaining two involve the ruling on defendants' motion for new trial because of excessiveness of the verdicts.

II. Plaintiffs' evidence as to defendants' liability consisted of testimony of Merlin J. Hogan, a highway patrolman, E. H. Lear, Hamilton County sheriff, and a portion of defendant Quirren's pre-trial deposition offered by plaintiffs.

Under their first two assignments defendants maintain, in view of plaintiffs' offer of Quirren's deposition describing movements of both vehicles before impact, the evidence was insufficient to warrant submission of any of the four specifications or generate a jury question on the issue any were a proximate cause of the collision.

Defendants assert the offered portion of Quirren's deposition clearly established as a matter of law negligence of the operator of plaintiffs' vehicle was a or the sole proximate cause of the collision and a legal excuse for Quirren's position on the highway to the left of the center line at impact. They argue plaintiffs, having elected to introduce this deposition and failed to contradict it, are bound thereby even though it destroys the testimony of Patrolman Hogan and Sheriff Lear.

They further assert even though we find evidence supporting one or more, but not all, of the specifications it was reversible error for the court not to withdraw the unsupported specifications since there must be evidence to support every specification of negligence submitted.

III. Quirren had left Moline, Illinois the afternoon of January 14 after loading three tractors weighing approximately 31,000 pounds to be delivered in Spirit River, Alberta. The Mack truck and trailer with an overall length of 54′ 9″ and width of 8′ weighed 27,000 without load. After stopping to visit his sister in Tiffin, Iowa and taking a four-hour nap, Quirren left there about 1 a. m. He stopped to check his load about 5:45 after crossing the railroad tracks in Jewell, about six miles south of the accident scene.

In that portion of his deposition offered by plaintiffs Quirren described the events leading up to the impact.

After the stop in Jewell he proceeded north at a speed not over 50 m. p. h. The road was dry and he estimated he could stop the loaded unit in less than the length of a football field, something like 300 feet. It was just near zero and visibility very good although not yet light. North of Jewell, the highway was vacant with the exception of one northbound truck which passed him shortly before the collision. Quirren observed this truck meet what was later learned to be the Schmitt car a half mile to a mile away. After passing the oncoming truck the Schmitt car came to Quirren's side of the road then back to Schmitt's own side when approximately a half mile away. Quirren speculated the driver was lighting a cigarette or something and paid little attention at the instance. About a quarter mile away the driver of the Schmitt vehicle came back again to Quirren's side of the road, perhaps not as far as the first time. Quirren blinked his lights during this second swerve of the Schmitt vehicle, held tight to his right-hand side of the road and then the Schmitt car returned to its side.

When approximately an eighth mile away the Schmitt car started a third gradual swerve into Quirren's lane. Quirren said as they closed on each other it looked very evident the Schmitt car had to go to Quirren's right in order to pass. In fact it looked like he was headed for the east ditch. About this point Quirren moved his unit so he had one set of wheels to the left of the center line. This was the end of his evasive action except to lift his foot from the accelerator about the time the Schmitt car started the third swerve. When they were less than 200 feet apart Quirren maintained his position with one set of wheels to the left of the center line. The Schmitt car swerved back to its right side of the road directly under him as they collided. He maintained he didn't have any indication until the last 20 seconds they were in trouble.

Quirren placed the Schmitt car at the point of impact with its two left wheels to the left of the center line, west of Quirren's right front wheels. As he recalled there was practically no ditch on either side

though there were some trees along the roadside.

IV. As a defense to the division based on Dorothy's death each defendant alleged generally in somewhat similar language that her negligence was a proximate cause of her death. In answer to the division seeking recovery for Theodore's death Jenkins made a similar allegation that the former's negligence was a proximate cause of his death. Plaintiffs did not attack these pleadings by motion for more specific statement.

A pleading containing a general averment of negligence states a good cause of action or defense, and, if unassailed by motion asking that the pleader more specifically state the allegations of negligence therein, the pleader would be entitled to introduce such evidence of specific acts of negligence as might tend to establish his cause or defense. Gebhardt v. McQuillen, 230 Iowa 181, 185, 297 N.W. 301, 303. See also Cavanaugh v. Jepson, filed May 6, 1969, Iowa, 167 N.W.2d 616, where after stating the same proposition in other words and citing several of our earlier opinions, we continued by saying, "When the *pleading* raises only the general issue of negligence, the trial court may, * * *, submit for jury consideration those specific acts of which the party could be found negligent under the *evidence*."

In answer to the division based on Theodore's death Sorge and Quirren stated specifically the manner in which Theodore was allegedly negligent. Sorge asserted Theodore's negligence in the respects alleged was the proximate cause of the collision and his death. Although Quirren alleged specific acts of negligence he did not assert they were either a proximate cause or contributing cause to Theodore's death or the collision.

Trial commenced September 12, 1967. Under these circumstances, if defendants relied on Dorothy's negligence as a complete defense or bar to recovery by her estate they had the burden to plead and prove such negligence contributed in any way or any degree directly to her injury or damage. Section 619.17, Code, 1966, as amended by Chapter 430, section 1, Acts of the Sixty-first General Assembly, effective July 4, 1965.

In Schultz v. Gosselink, 260 Iowa 115, 121, 148 N.W.2d 434, 437–438, we said:

"* * * [A]s to actions brought involving an accident which occurred prior to July 4, 1965, but trial commenced thereafter the burden is on defendant to plead and prove plaintiff's negligence contributed in any way or any degree directly to the injury or damage. However, in actions brought involving accidents which occurred on or subsequent to July 4, 1965, the defendant, if he relies upon the negligence of plaintiff as a complete defense or bar to plaintiff's recovery, has the burden of pleading and proving negligence of plaintiff was a proximate cause of the injury or damage.

"In the case at bar defendant, if he so desired, had the burden to plead and prove plaintiff was guilty of contributory negligence. The accident having happened before July 4, 1965, defendant, however, was only required to prove contributory negligence under the rule in effect prior to said date." See also Burch v. Witt, 260 Iowa 221, 222, 149 N.W.2d 126, 127, and Harlan v. Passot, 260 Iowa 501, 505, 150 N.W.2d 87, 90. In the latter case the above quotation is repeated wtih approval and section 619.17 as amended is set out at 505 of 260 Iowa, page 89 of 150 N.W.2d.

Although, as stated, defendants had the burden of proving Dorothy's negligence contributed in any way or any degree directly to her death, in pleading her negligence was a proximate cause of her death, defendants pleaded more than they were required to prove in view of the date of the accident. Harlan v. Passot, supra, 260 Iowa at 504, 150 N.W.2d at 89, and citations.

The same principles applied where defendants relied on Theodore's negligence as a defense or bar to recovery for his death.

Negligence of the operator of an automobile is not imputed to a passenger who has no right of control over it and the fact the operator is spouse of passenger does not alter the rule. Snook v. Long, 241 Iowa 665, 668, 42 N.W.2d 76, 77, 21 A.L.R.2d 1; Lockwood v. Wiltgen, 251 Iowa 484, 489, 101 N.W.2d 724, 727; and Mathews v. Beyer, 254 Iowa 52, 59, 116 N.W.2d 477, 481, and citations in these opinions. There was no evidence Dorothy had the right to control in some manner the operation of the automobile.

In the absence of an admission by the adverse party, it is not often that a party having the burden of proof upon an issue establishes it as a matter of law. Frideres v. Lowden, 235 Iowa 640, 642, 17 N.W.2d 396, 397; Bodish v. Fischer, Inc., 257 Iowa 516, 520, 133 N.W.2d 867, 869; and Estate of Goeders, 260 Iowa 87, 93, 148 N.W.2d 438, 442.

Theodore's alleged negligence becomes important on the question of sole proximate cause in the action to recover for Dorothy's death. Of course, the administrators of her estate had the burden to prove direct causal connection between negligence of defendant driver in one or more of the respects alleged and the happening of the collision. McMaster v. Hutchins, 255 Iowa 39, 47–48, 120 N.W.2d 509, 514 and Sayre v. Andrews, 259 Iowa 930, 942–943, 146 N.W.2d 336, 344. Under a general denial a defendant may refute proof of this essential by offering evidence that negligence of a third party, in this case Theodore, was the sole proximate cause of Dorothy's death. Kuehn v. Jenkins, 251 Iowa 718, 728, 100 N.W.2d 610, 616. All defendants had denied any negligence of Quirren was the proximate cause of decedents' deaths.

In passing upon defendants' contention that as a matter of law Quirren's deposition established Theodore's negligence as the sole proximate cause of the collision and Dorothy's death we view the evidence in the light most favorable to plaintiffs. Rule 344(f), par. 2, Rules of Civil Procedure. Even when the facts are not in dispute or contradicted, if reasonable minds might draw different inferences from them, a jury question is engendered. Rule 344(f), par. 17, R.C.P. This proposition is recognized in Hassebroch v. Weaver Construction Co., 246 Iowa 622, 625–627, 67 N.W.2d 549, 551–552 and Schneider v. Swaney Motor Car Co., 257 Iowa 1177, 1182–1183, 136 N.W.2d 338, 342 and Rice v. McDonald, 258 Iowa 372, 376, 138 N.W.2d 889, 891, where we quoted this with approval from Brinegar v. Green, 8 Cir., 117 F.2d 316, 319:

"The determination of the existence of negligence where the evidence is conflicting or the undisputed facts are such that fair-minded man may draw different conclusions from them is a question of fact for the jury and not one of law for the court."

The same principle is expressed in Lawson v. Fordyce, 234 Iowa 632, 635–636, 12 N.W.2d 301, 303–304, in this language:

" * * * [E]ven though it is known what was done by that individual in this regard, yet, if his conduct is such that there may fairly be different opinions with respect to it, and one man honestly and reasonably says it was in accord with ordinary prudence, while another just as sincerely and with equal reason contends it was not, then there is a jury question."

It was for the jury to determine whether plaintiffs had sustained their burden as stated, supra, or if the driver of the car in which Dorothy was riding was negligent and if so whether such negligence was the sole proximate cause of her death.

V. Another argument in support of defendants' contention the court erred in over-

ruling their motions for directed verdicts and to withdraw specifications of negligence is that Quirren's deposition established legal excuse for his position on the highway to the left of the center line at the moment of impact. They do not assert an instruction on legal excuse was improper under the circumstances. In fact, defendants requested an instruction embodying three of the four definitions of legal excuse set forth in Kisling v. Thierman, 214 Iowa 911, 916, 243 N.W. 552, 554, and the doctrine of sudden emergency. The court did not give the instruction in the requested language but instruction 12 did embrace both the doctrines of sudden emergency in the language of Uniform Jury Instruction 5.4 and legal excuse, using the first three definitions from Kisling v. Thierman, supra, and in substantially the language of Uniform Jury Instruction 5.7.

█ Defendants do not assign the giving of this instruction as error. This is a law action. "Our appellate jurisdiction is confined to the correction of errors. Rule 344(a) (3), Iowa Rules of Civil Procedure, 58 I.C.A., requires a statement of errors relied on for reversal when the appeal presents questions of law. We have repeatedly held that an error not assigned presents no question for review and need not be considered upon appeal. * * * [Citing authorities]." Associates Discount Corp. v. Held, 255 Iowa 680, 683–684, 123 N.W.2d 869, 871. The fact defendants requested an instruction on legal excuse is an additional reason why they are not now in a position to complain. "It is elementary a litigant cannot complain of error which he has invited or to which he has assented." Hackman v. Beckwith, 245 Iowa 791, 800, 64 N.W.2d 275, 281; Knudsen v. Merle Hay Plaza, Inc., Iowa, 160 N.W.2d 279, 285.

█ However, they maintain a legal excuse was established as a matter of law. Where the factual situation warrants giving an instruction on legal excuse it is not necessary in order to have the doctrine

considered and instructed upon that it be pleaded. Townsend v. Armstrong, 220 Iowa 396, 403–404, 260 N.W. 17, 21; Silvia v. Pennock, 253 Iowa 779, 785, 113 N.W.2d 749, 753, and citations. The burden of proof is upon defendants to establish legal excuse for violation of statutory rules of the road by a preponderance of the evidence and plaintiff is not required to prove defendants' violation was not excused. Peters v. Rieck, 257 Iowa 12, 19, 131 N.W. 2d 529, 533, citing McMaster v. Hutchins, 255 Iowa 39, 120 N.W.2d 509.

What is said in Division IV, supra, relative to a person having the burden of proof on an issue establishing it as a matter of law applies to this contention.

█ Further, Quirren's deposition as to the reason his vehicle was left of the center line does not establish such fact as a matter of law. The trier of fact may not totally disregard evidence, but it has the duty to weigh the evidence and determine credibility of witnesses. Re Claim of Gwynne v. Vance, 258 Iowa 875, 879, 140 N.W.2d 917, 919. Stated otherwise, the court and jury are not bound to accept testimony as true because it is not contradicted. Jordan v. Sinclair Refining Co., 257 Iowa 813, 822, 135 N.W.2d 120, 125, and citations. It was for the jury to determine whether Quirren was justified in being left of the center line under the circumstances, not alone from his deposition, but from all the evidence. Silvia v. Pennock, supra, 253 Iowa at 786, 113 N.W.2d at 753–754.

█ We must point out "travelling on the wrong side of a rural highway is not negligence per se in Iowa. It is only prima facie evidence of negligence. *But prima facie evidence is rebuttable.* * * * [Citing authorities]." Yost v. Miner, Iowa, 163 N.W.2d 557, 564. Noncompliance with this statute may be justified by evidence the motorist was in the exercise of reasonable care under the circumstances, notwithstanding such noncompliance.

In Wagaman v. Ryan, 258 Iowa 1352, 1359, 142 N.W.2d 413, 417, we said:

"Kisling v. Thierman, 214 Iowa 911, 916, 243 N.W. 552, 554, and numerous decisions which follow it hold that violation of a statutory rule of the road, *other than what is now section 321.298*, is negligence unless the offending driver shows a legal excuse therefor. * * * However, it is not necessary to show a legal excuse for violation of section 321.298. * * * [S]uch a violation is only prima facie or presumptive evidence of negligence which may be justified by evidence the motorist was in the exercise of reasonable care under the circumstances. Spry v. Lamont, supra, 257 Iowa 321, 332, 132 N.W.2d 446, 452, 453, and citations."

■ An instruction on legal excuse for violation of section 321.298 would place a greater burden on defendants than an instruction treating such a violation as only prima facie evidence of negligence, McMaster v. Hutchins, supra, 255 Iowa at 46–47, 120 N.W.2d at 513, but this question is not raised by defendants' contention.

As previously stated earlier in this division, the court instructed on the doctrine of sudden emergency.

In Young v. Hendricks, 226 Iowa 211, 215, 283 N.W. 895, 898, we said:

"An emergency has been variously defined as (1) an unforeseen combination of circumstances which calls for immediate action; (2) a perplexing contingency or complication of circumstances; (3) a sudden or unexpected occasion for action; exigency; pressing necessity." This definition was repeated in Brown v. Guiter, 256 Iowa 671, 678, 128 N.W.2d 896, 901; Baker v. Wolfe, Iowa, 164 N.W.2d 835, 839, and many other of our decisions.

For a discussion of the difference between legal excuse and sudden emergency see Yost v. Miner, supra, Iowa, 163 N.W. 2d at 562–563, and citations.

The necessity of pleading, the burden of proof and the nature and extent of sudden emergency are treated in Rice v. McDonald, 258 Iowa at 380–381, 138 N.W.2d at 893–894 and Baker v. Wolfe, both supra.

■ Where violation of section 321.298 is alleged as a specification of negligence and there is substantial evidence as to existence of an emergency, giving an instruction on sudden emergency is proper not as an excuse for violation of the statute but as one of the circumstances to be considered by the jury in determining whether the party seeking to invoke the doctrine was in the exercise of reasonable care under the circumstances notwithstanding such noncompliance. As support for this proposition see McKeever v. Batcheler, 219 Iowa 93, 96, 257 N.W. 567, 568.

■ Quirren's deposition did not establish either legal excuse or the existence of a sudden emergency as a matter of law. However, it did generate a jury question as to whether he was in the exercise of reasonable care as a justification for his position at moment of impact and it was proper to give an instruction on sudden emergency as a circumstance to be considered.

■ VI. Defendants' other contention urged in support of these first two assignments is that plaintiffs are bound by the deposition testimony of Quirren which is uncontradicted.

"In recent years statutes and rules of procedure have been enacted in many jurisdictions permitting a party to call his adversary or the latter's employee as a witness without vouching for the credibility of the witness or the loss of the right of impeachment." 32A C.J.S. Evidence § 1040 (2).

In 1965 the Sixty-first General Assembly of our legislature by chapter 431, section 1,

amended section 624.1 of the Code effective July 4, 1965, which now provides in part:

"\* \* \*

"A party may interrogate any unwilling or hostile witness by leading questions. A party may call an adverse party or an officer, director, or managing agent of a public or private corporation or of a partnership or association which is an adverse party, and interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party, and the witness thus called may be contradicted and impeached by or on behalf of the adverse party also, and may be cross-examined by the adverse party only upon the subject matter of his examination in chief."

The quoted portion of this section is a verbatim statement of rule 43(b), Federal Rules of Civil Procedure. 28 U.S.C.A.

Rule 145(b), R.C.P., provides:

"A party does not make deponent his own witness by taking his deposition or using it solely under rules 144*(a)* or 144*(b)*. A party introducing a deposition for any other purpose makes the deponent his witness, but may contradict his testimony by relevant evidence."

Rule 144(b) provides:

"For any purpose if, when it was taken, deponent was a party adverse to the offeror, or was an officer, partner or managing agent of any adverse party which is not a natural person; \* \* \* "

This statement appears in 32A C.J.S. Evidence § 1040(2):

"Under such statutes and rules, it has been held that a party calling his adversary as a witness is not concluded by his uncontradicted testimony, and that the party so eliciting evidence of the adverse party may rely on such portion of his testimony as is favorable to him, and is not bound by adverse testimony. This does not affect or alter the rule that, where a party having the burden of proof on an issue calls his adversary to testify and the adverse party gives adverse testimony on such issue, there is a failure of proof unless other evidence is offered."

Hutchison v. Boney, 72 N.M. 194, 382 P.2d 525, 527, is cited in support of the quoted statement. The opinion contains this:

"When other jurisdictions have been confronted with this question, they have resolved it by saying that while a party is not bound by the testimony of an adverse witness called under Rule 43(b), Rules of Civil Procedure, this means only that he was free to cross-examine, contradict and impeach these witnesses, and that even if the testimony was not contradicted, the trial court was not required to accept it as true, citing Moran v. Pittsburgh-Des Moines Steel Co., \* \* \* [3 Cir., 183 F.2d 467, 471–472]. They hold that testimony of an adverse witness is evidence in the case, to be weighed with all other evidence and given such probative value as the fact finder deems appropriate. \* \* \* [Citing authorities]."

In Moran v. Pittsburgh-Des Moines Steel Co., supra, we find this:

"\* \* \* It is frequently said in such situations that the party calling the witness is bound by his testimony. That rule has been assailed by Wigmore as a 'primitive notion' which 'no longer finds defenders.' But we need not in this case either affirm or repudiate that rule. Here, Jackson was called in the first place as an adverse witness under Rule 43(b), which expressly provides that such an adverse witness may be contradicted and impeached. Rule 43(b), we think, is utterly inconsistent with any notion about being bound by his testimony. It seems to us that any statement to the effect that a party is bound by the testimony of a witness whom he is free to contradict and impeach is inherently anomalous."

Former rule 1.37(a), now rule 1.450(a), Florida Rules of Civil Procedure, 30 F.S.A.,

corresponds with our amended Code section 624.1. In P. & N. Investment Corporation v. Rea, Fla.App., 153 So.2d 865, 868, that appellate court said in interpreting their rule:

" * * * [W]here an obviously adverse witness is called and interrogated * * * plaintiff is not bound by unfavorable testimony of such witness unless the evidence otherwise fails to demonstrate a *prima facie* case."

A similar thought is expressed in Nuelsen v. Sorensen, 9 Cir., 293 F.2d 454, 460, where this appears:

"It is true that appellants are not bound by the testimony of adverse witnesses called under rule 43(b). But this means only that they were free to cross examine, contradict and impeach these witnesses, and that even if the testimony was not contradicted, the court was not required to accept it as true. * * * The testimony of an adverse witness is nonetheless evidence in the case, to be weighed with all other evidence and given such probative value as the fact-finder deems appropriate."

Defendants' contention here was rejected in Becker v. Eisenstodt, 60 N.J.Super. 240, 248–249, 158 A.2d 706, 710–712, which criticizes the rule which held generally that a party by calling a witness represents him to be worthy of some credit and is therefore bound by his testimony. The opinion quotes 3 Wigmore on Evidence (Third Ed.), section 916, and refers to McCormick on Evidence, section 38.

The authorities cited establish the interpretation we believe the legislature intended by enactment of the amendment.

There is no logical distinction between calling Quirren as an adverse party under section 624.1 and using a portion of his deposition taken under rule 144(b), R.C.P. See Wilcox v. Hilligas, 254 Iowa 204, 207, 117 N.W.2d 42, 44. Also Kramer v. F. W. Woolworth Co., 255 Iowa 633, 639, 123 N.W.2d 572, 576, which considers the contention before the amendment to section 624.1.

Defendants' contention considered in this division is without merit.

VII. The remaining four assignments in the first division of defendants' written brief are directed to the four specifications of negligence submitted and instructions bearing thereon.

" * * * Whether a specification of negligence should be submitted depends, of course, upon the evidence which supports it", Cavanaugh v. Jepson, supra, and "[w]hen the court instructs the jury upon a certain question there must be some evidence upon which to base such instruction." Schneider v. Swaney Motor Car Co., 257 Iowa 1177, 1182, 136 N.W.2d 338, 341, and citations.

In considering the sufficiency of the evidence of defendants' negligence as against their motions for directed verdict and judgment notwithstanding the verdict, we view the evidence in the light most favorable to plaintiffs. This is the effect of rule 344(f), par. 2, R.C.P. Ling v. Hosts, Inc., Iowa, 164 N.W.2d 123, 124. It is likewise viewed when appeal is taken from judgment on verdict for plaintiff, Denison v. Wiese, 251 Iowa 770, 773, 102 N.W.2d 671, 673; Van Patten v. Chicago, R. I. & P. Co., 251 Iowa 1221, 1229, 102 N.W.2d 898, 903, and when we consider whether there is evidentiary support for an instruction. Schneider v. Swaney Motor Car Co., supra. We need consider only the evidence favorable to plaintiff, whether or not it was contradicted. Tuttle v. Longnecker, 258 Iowa 393, 396, 138 N.W.2d 851, 853; and Hall v. Wright, Iowa, 156 N.W.2d 661, 668–669. To entitle plaintiffs to have their cases considered by a jury there must be facts from which the inference of negligence may be fairly drawn. Martin v. Cafer, 258 Iowa 176, 179, 138 N.W.2d 71, 73. The jury's findings are binding upon us if supported by substantial evidence. Rule 344 (f), par. 1, R.C.P.

Disregarding Quirren's deposition there is substantial evidence warranting submission of plaintiffs' specification asserting violation of section 321.298.

Merlin J. Hogan, with 19 years' experience on the highway patrol, arrived at the scene at 6:40 a. m. sometime after the Webster City ambulance crew and not over five minutes before Sheriff Lear.

As plaintiffs' first witness, he described the scene, identified a diagram previously made showing the marks visible at the time of the accident and measurements taken by him and the sheriff (exhibit 1) and photographs of the scene as it appeared that morning (exhibits 2 through 8). The diagram and photographs were received in evidence without objection.

The right-of-way of U. S. Highway 69 at the point material is 100 feet wide, the paved portion 23′ 8″, the west half being 11′ 10″. The road is straight and upgrade for quite a distance.

The vehicles came to rest on the west shoulder of the highway with the semi on top the front end of the Schmitt Pontiac and the back end of the trailer still on the pavement. Defendants' unit was headed at a sharp angle to the northwest.

The distance from the center line of the highway to the center of the vehicles was 24′ 9″, with the right rear wheel of the truck 12′ 7″ from the center line, off the shoulder. It was 4′ 8″ from the center line to the right rear dual wheels of the trailer. One hundred eighty feet south from the center of the vehicles there was a gouge mark in the pavement about 1½″ deep, a foot long, perhaps 3″ wide. This mark was 4′ 10″ west of the center line. On the west shoulder in the vicinity of this scrape mark there was debris such as one would find from the Pontiac: a hubcap, part of a grill, a rim around the headlights, glass from the headlights and other small pieces from the front end of the Pontiac.

Distinguishable tire marks of 313′ 6″ commenced 133′ 6″ south of this gouge, 14″ east of the west edge of the pavement and continued in almost a straight line never more than 16–18″ east of the west edge, north to the rear of defendants' unit.

Another set of dual tire marks continued north from the gouge mark in an arc east across the center line and then back to the back right rear dual wheel. A corresponding set arced around and went to the left rear trailer wheels. Only the right marks led over the center line.

Hogan testified there was no evidence south of where the tire marks commenced indicating a sudden turn.

Lear, Hamilton County sheriff continuously since August 9, 1938, had investigated an estimated 300 accidents, several involving semi trailers which had jackknifed and skidded. In this incident he assisted in making the measurements recorded by Hogan. He identified the marks and measurements on the diagram as representing those he had observed.

Over the objection the matter called for an opinion and conclusion of the witness, no proper qualification or foundation, Lear was permitted to testify that in his opinion the curved or arc-type skid marks on exhibit 1 were caused by the rear wheels of the trailer jackknifing to the right, the dual marks were caused by the tractor part of the unit and the point of impact was 180 feet south from the rear end of the trailer where the debris was found on the west shoulder. The same objection to Lear's testimony was renewed several times, no other grounds were ever urged.

Photographs (exhibit 8, defendants' exhibits 1 and 2) indicate the point of impact between the two vehicles was to the left front fender and the bumper of the tractor and the left front of the 4000-pound Pontiac which was demolished.

" * * * [T]he deductions to be made from the positions of the vehicles as they came to rest after an accident, the tracks found on the roadway, and the location of dirt and debris from collisions, are ordinar-

ily for the jury. * * * [Citing authorities]." Hackman v. Beckwith, supra, 245 Iowa at 797, 64 N.W.2d at 279.

There is the additional fact at pretrial conference the parties stipulated that following the accident Quirren pleaded guilty to a charge of failing to yield half the road by turning to the right on this occasion.

■ This admission with the permissible inferences reasonable minds might draw from the physical facts support submission of plaintiffs' first specification of negligence, failure to give half the traveled portion of the highway by turning to the right.

■ It is undisputed the collision occurred on the west side of the road. Where there is evidence one party was driving on his left-hand side of the road, lookout is necessarily involved. Pazen v. Des Moines Transportation Co., 223 Iowa 23, 27–28, 272 N.W. 126, 129; Hackman v. Beckwith, supra, 245 Iowa at 802–803, 64 N.W.2d at 282; Law v. Hemmingsen, 249 Iowa 820, 829–830, 89 N.W.2d 386, 393; and Spry v. Lamont, supra, 257 Iowa at 329, 132 N.W.2d at 451.

Unless we are to presume Quirren willfully failed to yield half the road, there arises a fair inference he failed to keep a proper lookout (plaintiffs' second specification) and have his unit under control (plaintiffs' third specification).

The Hemmingsen opinion quotes this from Hackman which applies here:

" 'There was evidence * * * that defendants' vehicle was on its left-hand side. As said in Pazen v. Des Moines Transportation Co., 223 Iowa 23, 27, 28, 272 N.W. 126, [129], unless we are to presume it was driven there willfully, there arises a fair inference of failure to keep a proper lookout. Motorists do not ordinarily drive on the left in the face of a near approaching vehicle if they see it coming; and if they do not, the question of lookout may

become a material one, proper for the jury's consideration.' "

Bradt v. Grell Construction, Inc., Iowa, 161 N.W.2d 336, 341–342, contains this:

"Keeping a proper lookout is not a statutory duty in Iowa but motorists have a common-law duty to exercise ordinary care under the circumstances in maintaining a lookout. Mathews v. Beyer, 254 Iowa 52, 57, 116 N.W.2d 477, 480; McClenahan v. Des Moines Transit Co., supra, 257 Iowa [293] at 297, 132 N.W.2d [471] at 474. Proper lookout means more than merely to look and see an object. It implies being watchful of the movements of the driver's vehicle in relation to other things seen and which could be discerned or seen in the exercise of ordinary care. It involves care, watchfulness and attention of the ordinarily prudent person under the circumstances. * * * [Citing authorities]."

■ Quirren's deposition described his own conduct from the time he observed the Schmitt car meeting the other northbound truck from a half to a mile away until the point of impact. Reasonable minds might draw different inferences whether he had fulfilled his duty to exercise ordinary care in maintaining a proper lookout as that term is defined.

In Schneider v. Swaney Motor Car Co., supra, 257 Iowa at 1184, 136 N.W.2d at 342, we said:

"A motor vehicle is 'under control' if it is moving at such a rate of speed and the driver has the mechanism and power under such control that it can be brought to a stop with a reasonable degree of celerity. * * * [Citing authority]. Of course the existing conditions must be considered. * * * [Citing authority]. 'Manifestly, the ability to turn the automobile and to expeditiously change its course to avoid collision or injury may have something to do with the "control" of an automobile. The present ability to increase or decrease the speed at which a car is moving and likewise the ability to divert or change

its course may be properly involved in the question of control.' * * * [Citing authorities]." See also Tillotson v. Schwarck, 259 Iowa 161, 169, 143 N.W.2d 284, 288–289.

Quirren estimated Schmitts' speed at one point as they came toward him at 50 m.p.h.; the last time he looked at his instrument panel he was traveling about 50 m. p. h. When the Pontiac was 660 feet away Quirren moved his vehicle to the left of the center line, let up on the accelerator slowing to possibly 40 m.p.h. On his 55-foot unit he had a wheel or rolling load of 31,000 pounds and although he had estimated he could make a "panic stop" in 300 feet, he testified if he applied the brakes that strongly there was a possibility of throwing one of the tractors loose. Quirren admitted he couldn't stop fast enough to keep from hitting the Pontiac and didn't know whether there was a clear shoulder to his right.

The question is whether Quirren in operating this loaded unit under the circumstances had the ability to divert or change his course as the circumstances required. See Guinn v. Millard Truck Lines, Inc., 257 Iowa 671, 678, 134 N.W.2d 549, 554. We are concerned only with the sufficiency of the evidence to raise a jury question on the issue of lack of control.

■ It was proper to permit the jury to decide under the circumstances here guided by the principles quoted from Swaney, supra, whether Quirren had control of the vehicle.

■ In considering the sufficiency of evidence to justify submission to the jury of the issue of defendants' excessive speed under the circumstances (plaintiffs' fourth specification) as stated, we view the evidence in the light most favorable to plaintiffs. We have held many times that speed may be proven by circumstantial evidence. Guinn v. Millard Truck Lines, Inc., supra, and Walker v. Sedrel, 260 Iowa 625, 632 633, 149 N.W.2d 874, 878, and citations in

these opinions. " * * * [D]riving an automobile into another in plain sight is evidence of negligence. It is evidence of improper lookout, lack of control [and] speed * * * · and undoubtedly other specific acts of negligence." Ruud v. Grimm, 252 Iowa 1266, 1274, 110 N.W.2d 321, 325.

■ In view of all the evidence, the jury was not required to accept Quirren's answer as a verity as to his speed at the time and place of the collision. Walker v. Sedrel, supra.

The court properly submitted and instructed upon the issues presented by plaintiffs' four specifications.

VIII. Defendants argue their seventh assigned error in the second division of their brief. They contend the court erred in giving instruction 13 and refusing their requested instruction 2. Their complaint as to instruction 13 is directed to the court's failure to advise the jury of Dorothy Schmitt's duties as a passenger.

Instruction 13 informed the jury in Dorothy's action if plaintiffs established all propositions set out in instruction 6 they should take up the affirmative defense asserted by defendants that plaintiffs' decedent, Dorothy, was negligent. It properly placed the burden on defendants of establishing by a preponderance of the evidence such negligence contributed in any way or any degree directly to her death and told the jury if so established, her estate could not recover.

The court defined negligence and contributory negligence. The instruction requested by defendants was in substance Uniform Instruction 2.5 defining the duty owed as a passenger for her own safety.

Plaintiffs maintain defendants were not entitled to the requested instruction since they had not pleaded specific acts of Dorothy's negligence. As previously noted, in Division IV supra, plaintiffs' failure to attack defendants' pleading of this

affirmative defense by a motion for more specific statement entitled defendants to introduce such evidence of negligence as might tend to establish this defense.

 However, there is nothing in the record as to what Dorothy did or failed to do for her own safety. We held in Division IV, supra, Theodore's negligence, if any, was not imputable to his wife and if defendants relied upon Dorothy's negligence as a complete defense or bar to recovery under the circumstances they had the burden to prove her negligence contributed in any way or any degree to her death. In other words, it was defendants' burden to produce some evidence to justify giving this instruction. Having failed to do so, their contention is without merit. There must be some evidence on which to base an instruction. Schneider v. Swaney Motor Car Co.; Cavanaugh v. Jepson; and Walker v. Sedrel, all supra.

IX. In support of their ninth assigned error defendants assert the court erred in admitting over objection Sheriff Lear's opinion as to point of impact and that the trailer had jackknifed.

 Their contention that his opinion as to point of impact was based in whole or in part upon hearsay was not urged at trial nor in defendants' motion for new trial. It cannot be urged for the first time on appeal. Jones v. Iowa State Highway Commission, Iowa, 157 N.W.2d 86, 92. Their assertion Lear was not qualified to express an opinion as to point of impact must also be rejected. Brower v. Quick, 249 Iowa 569, 576–578, 88 N.W.2d 120, 124–125; Long v. Gilchrist, 251 Iowa 1294, 1297–1298, 105 N.W.2d 82, 84; and Dougherty v. Boyken, Iowa, 155 N.W.2d 488, 490–493, and citations in these opinions.

Lear had an opportunity to investigate the scene reasonably soon after the accident and had sufficient evidence to form a reasonable opinion based on his observation as to the point of impact. Lessenhop v. Norton, Iowa, 153 N.W.2d 107, 114.

The fact the diagram indicating "deep scrape marks believed to be north point of impact" was received without objection is a further reason this contention cannot be accepted. Marean v. Petersen, 259 Iowa 557, 564, 144 N.W.2d 906, 910.

Defendants' further objection to Lear's testimony may be summarized as contending he was not shown qualified to give opinions as to the probable course Quirren's vehicle took after impact or that certain marks on the pavement were made by defendants' tractor-trailer unit; these opinions were mere speculation on his part.

We consider these contentions in reverse order.

 During cross-examination Lear was asked to account for absence of a parallel skid mark from point of impact north to match the one he attributed to defendants' tractor. As Lear remembered there were dual wheel marks on the west shoulder from the point of impact to the trailer and suggested the one prominent skid mark was possibly caused by the brakes. Asked if this wasn't speculation on his part, Lear answered, "Most of them are speculative." When asked as to the possibility of the trailer making the arc-shaped marks north of the impact, in view of his opinion as to what had caused the tire marks south of impact, he replied, "Well that depends on the applying of the brakes. Speculation."

At this point defendants neither renewed their objections originally urged to Lear's expressing an opinion nor moved to strike his testimony given on direct examination. His opinion remained in the record. Under the circumstances the facts brought out on cross-examination affected merely the weight of his opinion not its admissibility.

In considering defendants' objection to Lear's qualifications to give an opinion that the curved or arc-type marks portrayed on the diagram were caused by defendants' trailer jackknifing after impact, it is important to remember his opinion was

not given in response to a hypothetical question.

Some distinction is noted in various jurisdictions in reference to the admission in evidence of opinions of experts based upon facts related to them in a hypothetical question and of opinions of experts or non-experts when testifying about facts they had personally observed. See 7 Wigmore on Evidence, Third Ed., sections 1917–1929.

Lear, an investigating officer, had the opportunity to observe the vehicles before they had been moved, location of debris, the gouge mark in the pavement and the tracks leading up to the rear duals of the trailer. From the conditions at the scene he could easily and reliably trace the tracks backward along the road and determine, as a fact, from his personal observation, the exact point where the tire marks commenced, the point of impact and the course of these marks from that point on to the vehicle. What he observed at the scene might have helped to qualify him to give an opinion as to the cause of the arc-type marks.

Lear testified as a result of "having covered several accidents and seeing the action of semi-trailers do the same—practically the same thing in regards to jackknifing and skidding along, how the rear end will come out as the tractor goes ahead," it was his opinion the curve marks were caused by the rear duals of Quirren's trailer—an opinion based upon his experience and observation.

The thoroughness with which Lear in cooperation with Hogan made measurements and study of the scene gave him knowledge beyond that of an average layman and made it probable that his opinion would be of assistance to the trier of facts.

At the time of defendants' original objection the court expressed belief the sheriff was qualified in this particular field.

Of course, as the court told the jury in instruction 22 it was their province to determine what weight Lear's opinion should receive and the jury was not bound to accept such opinion.

■ Where the witness has disclosed a sufficient knowledge of the subject to entitle his opinion to go to the jury the question of the degree of his knowledge goes more to the weight of the evidence than its admissibility. Marean v. Petersen, supra.

■ The trial court did not abuse its discretion in admitting this testimony. In support see Brower v. Quick, supra, 249 Iowa at 576–581, 88 N.W.2d at 124–127, where this court permitted the investigating patrolman to testify as to the possibility of defendant's car bouncing from the visible marks to the place where it came to rest. Many authorities are cited and reviewed in that opinion.

It was for the jury to make its deduction from this and all the evidence whether defendants were negligent in one or more of the respects asserted in plaintiff's specifications.

X. Under another assignment defendants contend the court erred in permitting plaintiffs to use a portion of Hogan's pretrial deposition in rebuttal after he had been called and testified as a witness in plaintiffs' case in chief. After so testifying and being cross-examined by defendants, Hogan, although not formally excused by the court at the completion of his testimony, left Davenport and returned to Des Moines to attend another hearing.

Shortly before defendants rested Quirren testified as to the reason and circumstances surrounding his plea in justice court to the charge of failing to yield half the traveled portion of the highway. The question arose the following morning when court convened. Plaintiffs indicated their desire to offer a portion of Hogan's deposition in rebuttal and made a showing that Hogan was then unavailable, more than 100 miles distant from trial and when contacted the night before by telephone, Hogan advised

he would be occupied in the Des Moines hearing for some time the next day. These facts are undisputed in the record.

Plaintiffs' offer of part of defendants' cross-examination of Hogan at the pre-trial deposition was then received over defendants' objection that it was improper, not the best evidence and unfair to defendants. Of course, it was contrary to Quirren's explanation of why he pleaded guilty before the justice of the peace.

In support of this specification of error defendants argue Hogan had submitted himself to the court's jurisdiction when he testified, as previously noted, and the parties were entitled to assume he would be available if needed unless excused; plaintiffs had opportunity to compel his continued presence and, having failed to do so, are not in a position to rely on the provisions of rule 144(c), R.C.P., as support for the trial court's ruling. This rule provides:

"For any purpose, if the court finds that the offeror was unable to procure deponent's presence at the trial by subpoena; or that deponent is out of the state or more than one hundred miles distant from the trial, and such absence was not procured by the offeror; or that deponent is dead, or unable to testify because of age, illness, infirmity or imprisonment."

Cf., rule 26, Federal Rules of Civil Procedure, 28 U.S.C.A.

Defendants' contention raises the issue whether this rule permits a portion of a non-party witness' deposition to be received in rebuttal where the deponent has testified as a witness in the offeror's main case and is not available or more than 100 miles distant from the trial when the deposition is offered.

█ Unavailability of the deponent as well as admissibility of a deposition is to be determined by the court and depends generally upon the conditions which exist at the time it is offered. Goldstein v. Pennsylvania Greyhound Lines, 23 N.J.Super. 126, 92 A.2d 637, 639; 2A Barron and

Holtzoff, Federal Practice and Procedure, section 654, page 163.

The jury had had opportunity to judge Hogan's credibility when testifying as plaintiffs' first witness.

"Where the witness, at some time since trial begun and prior to the moment when his deposition is offered, has been within reach of process, but is *not at the precise moment,* the deposition's admissibility would seem to depend on whether the witness' absence is due in any respect to bad faith on the proponent's part; * * *." 5 Wigmore on Evidence, Third Ed., section 1415.

There is no suggestion in this record that anyone concerned acted in bad faith or that Hogan's absence when a part of his deposition was offered was procured by plaintiffs.

█ We approve the quoted statement from Wigmore, supra, and now hold that when the court is satisfied the conditions precedent provided in rule 144(c), R.C.P., have been established, it may receive a witness' deposition who, though previously present during the trial, is not when his deposition is later offered. Being within the trial court's discretion, there was no abuse here.

This is not a factual situation for application of the rule recognized in Brandon v. Schroeder, Tex.Civ.App., Galveston, 167 S.W.2d 599, 602; and 97 C.J.S. Witnesses § 20, that ordinarily witnesses may be compelled to attend on court until dismissed by the court or the party who summoned them as defendants contend.

XI. The assignments of error thus far considered concern the issue of defendants' liability. Their remaining contentions involve the issue of damages and require some additional facts.

Dorothy Schmitt, 38 and in general good health at death, had a life expectancy of 33.97 years. Her husband, 44, a high school graduate who had further training in busi-

ness college, night school and correspondence courses, had engaged in electrical engineering work before moving to Webster City. He was in general good health and had a life expectancy of 28.67. They are survived by six minor children ranging in age from 5–19.

On an earlier appeal in this matter, Schmitt v. Jenkins Truck Lines, Inc., 260 Iowa 556, 149 N.W.2d 789, we held what is now designated as Code section 613.15 would permit recovery as damages present worth or value of support and services of plaintiffs' decedents as parents. It does not afford a remedy for loss of service or support of a spouse where none survives. This section provides:

"In any action for damages because of the wrongful or negligent injury or death of a woman, there shall be no disabilities or restrictions, and recovery may be had on account thereof in the same manner as in cases of damage because of the wrongful or negligent injury or death of a man. In addition she, or her administrator for her estate, may recover for physician's services, nursing and hospital expense, and in the case of both women and men, such person, or the appropriate administrator, may recover the value of *services and support as* spouse or *parent* or both, as the case may be, in such sum as the jury deems proper; provided, however, recovery for these elements of damage may not be had by the spouse and children, as such, of any person who, or whose administrator, is entitled to recover same" (Emphasis supplied).

The Schmitt family moved to Webster City in 1962. As superintendent of public utilities there, Mr. Schmitt was responsible for management and operation of its electrical power plant, including its distribution or line department, water plant and distribution system, sewage disposal plant and its system. He had served as acting city manager for a few months at a salary of $10,000 a year. As superintendent for the balance of 1964 to the date of death he was paid on the basis of $9620 per year.

Several Webster City acquaintances and friends testified the Schmitts were very unusual parents in their great love for their children and the time and thought given to the training of their children who were well disciplined in an excellent family environment and always looked well dressed. Both parents were active in church work and community affairs, frugal and possessed of good judgment. When the children came to them with a problem, both Theodore and Dorothy would sit down, go over it and treat it with importance. As one witness observed, they handled problems with their children in such a manner "that it made you wish you had done it yourself". They and their children worked well as a family and maintained two gardens from which they harvested produce for their freezer for the winter. Theodore and Dorothy preferred to take their children with them to parties and picnics rather than leave them with a babysitter. The witnesses told of many picnics and outings attended by the Schmitts and their children.

Several characterized Theodore as being temperate and generally thrifty with an ability to save money. Those who had worked with him considered him very methodical, a detailed planner with a lot of drive and enthusiasm toward his job and one who worked long hours to accomplish any project undertaken. They agreed his moral character and record for family support were excellent.

For about one year before marriage Dorothy had worked as a bookkeeper at Sears, Roebuck and Company. Since married, she had not been employed outside the home. As a mother she was known to be an accomplished seamstress—making most of her own and her children's clothing, even the coats—an excellent cook and skilled homemaker—canning produce from the garden. She was very ambitious, always trying to improve her work, had enrolled

in night courses in the community school in sewing and related subjects. She was a Girl Scout leader.

XII. In the second paragraph of instruction 14 the jury was told that if it found plaintiffs entitled to recover damages for Dorothy's death, one element to be considered in arriving at the amount of recovery was the present worth of such sum as would fairly and reasonably compensate her estate for loss of services performed by her as a mother.

In the third paragraph of this instruction the jury was told another element was the present worth for loss of financial support to the children which would have resulted from Dorothy's continued life. They were instructed that in determining the amount of this loss, *if any,* they should consider Dorothy's probable future earnings, had she lived, based on her past earnings, occupation, experience, capabilities, health, length of time she probably would have lived, her ability and disposition to work during what presumably would have been her life had she not died.

Defendants made timely objection in the trial court to paragraph 3 of instruction 14, contending there was no evidence Mrs. Schmitt had ever been gainfully employed during the marriage or of any future expectations or plans for her to be so engaged other than as a mother and homemaker; submitting this portion of instruction 14 permitted the jury to allow damages to her estate for an item not supported by evidence. Here defendants assign this contention as error, maintaining there was no evidence from which the jury could calculate her future earnings or that she had contributed to the financial support of her children.

Plaintiffs urge in support of this paragraph of instruction 14 testimony as to Dorothy's making clothes, coats and hats, her constant sewing, canning, preserving and freezing garden produce was substantial proof of her financial support for the family. They contend the fact there were expenditures of only $5500 over a two-year period for groceries and milk for eight people as shown in exhibit 9 is strong evidence her constant work with garden produce was a financial contribution; because of her sewing there were expenditures of only $262.08 for clothes for eight people for the two years itemized in exhibit 9. They maintain this is futher evidence of her financial contribution to this family.

Exhibit 9 is a summary prepared by Judy, second oldest of the Schmitt children, from checks for the years 1963 and 1964 on her father's only checking account. As a witness she had for defendants' inspection or use for cross-examination the canceled checks and stubs from which this summary was made. The breakdown listed expenditures for various family expenses including those referred to above. Over defendants' objection as being irrelevant to any measure of damages, immaterial and invading the province of the jury Judy explained the general breakdown made from the checks. The exhibit was received in evidence over the same objection.

" * * * [T]he objection that the question invades the province of the jury is generally not available in Iowa, since the decision in Grismore v. Consolidated Products Company, 232 Iowa 328, 348–362, 5 N.W. 2d 646, 655–663." State v. Hodge, 252 Iowa 449, 460, 105 N.W.2d 613, 619.

We do not agree with defendants' assertion there was a lack of evidence Dorothy had contributed to the financial support of her children.

Defendants' second attack on this instruction complains the jury was told that in determining the amount of loss of financial support they should consider Dorothy's probable future earnings when there was no evidence from which the jury could make such calculation.

It is true Dorothy had not been employed outside the home since marriage, but it may not be said she had no earning capacity. Shover v. Iowa Lutheran Hospi-

tal, 252 Iowa 706, 722, 107 N.W.2d 85, 94, and citations. A person may not have worked or may have had no income prior to fatal injury but still suffer destruction of future earning capacity. Anthes v. Anthes, 258 Iowa 260, 270, 139 N.W.2d 201, 208, and citations.

In determining present worth of financial contributions, if any, which the Schmitt children might reasonably expect to result from Dorothy's continued life, the question is what evidence is required to help the jury measure the extent of loss suffered by destruction of a parent's earning capacity by death.

██ The general rule appears to be that the trier of fact is entitled to consider on this issue of damages decedent's characteristics and habits including her general ability, other occupations she was qualified to fulfill, her industriousness, disposition to earn, intelligence, manner of living, sobriety or intemperance, frugality or lavishness, other personal characteristics that are of assistance in securing business or earning money, her age and life expectancy. See 22 Am.Jur.2d, Death, section 144 and 25A C.J.S. Death § 122, and DeToskey v. Ruan Transport Corp., 241 Iowa 45, 48, 40 N.W.2d 4, 6, 17 A.L.R.2d 826; Hornstein v. Marks, 21 Conn.Super. 233, 235, 153 A.2d 923, 925; Smith v. Lassing, Fla.App., 189 So.2d 244, 247; Caudle v. Southern Railway Co., 242 N.C. 466, 469, 88 S.E.2d 138, 140; and Southern Railway Co. v. Sloan, 56 Tenn. App. 380, 389, 407 S.W.2d 205, 210, cited in support in footnotes of these encyclopedias.

The jury was told in the third paragraph of the criticized instruction upon what factors to base its determination. After deciding which of these Dorothy possessed it was to answer the question what she was capable of earning.

There is substantial evidence upon which to ascertain the answer.

Elaine Scribbins, mother of four children, teacher with a Master's degree in the Webster City junior high school, tells us the main areas now in home economics are food management and nutrition, child care, family relationships, money management, housing and home furnishing. She had known the Schmitt family since they came to Webster City, was well acquainted with Dorothy and her capabilities from visiting in her home frequently, exchanging ideas about their children and homes. In her opinion $2 an hour would be a fair price for a housekeeper with Dorothy's ability. She also testified as to the value of Dorothy's services as a mother which we will consider in a later division.

"Courts have recognized a distinction between proof of the fact that damages have been sustained and proof of the amount of those damages. If it is speculative and uncertain whether damages have been sustained, recovery is denied. If the uncertainty lies only in the amount of damages, recovery may be had if there is proof of a reasonable basis for which the amount can be inferred or approximated. * * * [Citing authorities]." Orkin Exterminating Co. (Arwell Div.) v. Burnett, Iowa, 160 N.W.2d 427, 430.

There can be no uncertainty or speculation whether damages were sustained under the circumstances here. If Dorothy had offered her capabilities as a seamstress and cook for sale on the market, some income would have resulted. Instead of having this income to contribute toward the financial support of her family the jury could properly find her talents made it unnecessary to expend larger amounts for clothes and food. The savings thus effected made cash available for other family needs and constituted financial support that existed at Dorothy's death which the children might reasonably suppose to continue in the future, in view of her character, habits, occupations and prospects in life. See 25A C.J.S. Death § 102.

██ The amount suffered by destruction of this earning capacity might properly be inferred or approximated from the evi-

dence. Nothing more was required to justify giving the instruction.

XIII. Defendants assign still another error-admission over their objection to Elaine Scribbins' opinion as to the value of Dorothy's services as a mother.

After detailing her background in home economics and her acquaintance with Dorothy and the children she was asked if, as a trained person in the field of home economics, she had an opinion as to the value of a mother's services. Over defendants' objection "on the basis that no proper qualification or foundation has been laid; incompetent, irrelevant and immaterial" later expanded to include "and no proper showing, by the witness' own testimony, of qualifications in all of the various fields which go to make up this area" she was permitted to estimate, "Something close to $200 a week might not be out of line." This was in addition to an approximated cost of $100 per week for a person capable of performing house work as required for the Schmitt family.

Rulings on evidence cannot be assigned as error unless the nature of the error was called to the attention of the judge, so as to alert him to the proper course of action and enable opposing counsel to take corrective measures. Of course, the general objection to admission of evidence is sufficient where the grounds of incompetency are obvious. Some of our cases approving this principle are: Jackson v. Chicago, M., St. P. & P. R. Co., 238 Iowa 1253, 1263, 30 N.W.2d 97, 103; Kunzman v. Cherokee Silo Co., 253 Iowa 885, 893, 114 N.W.2d 534, 539, 95 A.L.R.2d 673; Daniels v. Bloomquist, 258 Iowa 301, 309–310, 138 N.W.2d 868, 873–874; Linge v. Iowa State Highway Comm., Iowa, 150 N.W.2d 642, 645–646; Bengford v. Carlem Corp., Iowa, 156 N.W.2d 855, 865; and Hedges v. Conder, Iowa, 166 N.W.2d 844, 856.

It is doubtful defendants' objection preserves the alleged error but, assuming arguendo that as later enlarged it did point out in what particulars defendants believed the evidence to be objectionable, the contention is without merit.

"The courts and other authorities uniformly agree that the receipt of opinion evidence, whether lay or expert, and the extent to which it will be received in any particular case, are matters resting largely in the administrative discretion of the court. * * * [Citing authorities]." Grismore v. Consolidated Products Co., supra, 232 Iowa at 342, 5 N.W.2d at 654.

"It is well settled in Iowa that if a witness is possessed of special training, experience, or knowledge in respect to the matter under investigation, and if his opinion based on evidentiary facts will be of aid to the jury in reaching a correct conclusion, and if the opinion expressed does not bind the jury to accept it, but leaves the ultimate conclusion to be determined by the judgment of the jurors themselves, such testimony is not improper nor prejudicial. * * [Citing authorities]." Brower v. Quick, supra, 249 Iowa at 578, 88 N.W.2d at 125. See also Mundy v. Olds, 254 Iowa 1095, 1104, 120 N.W.2d 469, 475, and Henneman v. McCalla, 260 Iowa 60, 78, 148 N.W.2d 447, 458.

The evidence from which the jury makes its determination need not be so definite as to be capable of exact mathematical computation. Nicholson v. City of Des Moines, 246 Iowa 318, 327, 67 N.W.2d 533, 538.

In Henneman v. McCalla, supra, we approved this from Bridenstine v. Iowa City Elec. R. Co., 181 Iowa 1124, 1134, 165 N.W. 435, 439:

"The services of a competent wife or mother cannot be weighed in the scales of the money changer. And indeed it would seem almost frivolous to call witnesses to estimate their monetary value. The best that can be done is to prove the facts and circumstances of the woman's life and service in these capacities, her age, health and strength, her expectancy of life, and all that may appear to enlighten the minds and aid the judgment of the jurors, and leave

them to assess such recovery within the statutory limit as they find and believe to be just."

Difficulty of ascertainment is no longer confused with right of recovery for damages sustained as a proximate result of another's negligence. See quote from Orkin Exterminating Co. v. Burnett, supra.

■ Defendants' further contention that a witness should not be accepted as an expert if she does not believe herself qualified cannot be sustained. The court, not the witness, determines the fact of her capacity to testify. 2 Wigmore on Evidence, Third Ed., section 487.

Under similar factual circumstances in Henneman v. McCalla, supra, 260 Iowa at 79, 148 N.W.2d at 458, we said in passing upon the admissibility of opinion testimony as to value of services of a deceased wife and mother, "We are not here dealing with that which necessarily stands in the field of expert testimony."

■ Considering Mrs. Scribbins' qualifications in the field of home economics, experience as a mother, acquaintance with Mrs. Schmitt and the children and in light of the guidelines announced in Brower v. Quick, supra, the court did not abuse its sound discretion in permitting her to testify as to the value of a mother's services. It was the jury's province to determine the weight to be given her testimony as directed in instruction 22.

Defendants' remaining challenges to Mrs. Scribbins' testimony here present no question for review. "A party cannot ordinarily complain of the receipt of evidence to which no timely objection was made, at least without a reasonable excuse for not objecting." Castner v. Wright, 256 Iowa 638, 652, 127 N.W.2d 583, 591, 128 N.W.2d 885. No such excuse appears here. This is merely an application of the familiar rule that an appellant may not urge for the first time here a contention not raised in the trial court. Frederick v. Goff, 251 Iowa 290, 296, 100 N.W.2d 624, 628.

XVI. Defendants' twelfth assignment attacks the court's ruling in admitting over objection testimony of Charles E. Marberry and plaintiffs' exhibits 13, 14 and 15 and in failing to strike this witness' testimony for reasons urged.

Mr. Marberry, a professor of finance at the University of Iowa, received a Bachelor's degree majoring in economics from the University of Illinois in 1948. He received a Master of Arts in economics after attending Stanford University for one year before returning to the University of Illinois for three years where he received a Ph.D. in economics and finance while teaching finance at this university. He taught at the University of Arkansas five years and from 1957–1959 at the University of Delaware. He had been at the University of Iowa since 1959, was a member of several honorary societies, as both an undergraduate and a graduate student. He was a member of various associations concerned with economics, finance and business, had served as consultant for two summers to Gulf Oil Company and had several articles published in finance journals.

At plaintiffs' request Mr. Marberry made a study of wage trends in the public power industry, particularly concerning supervisory or executive personnel. He detailed the various sources he had researched in making his study and testified a conservative estimate of the over-all trend in wage rates going back to 1909 would be 4 percent, based on the total economy.

He had prepared exhibit 13, a chart entitled "Loss Arising Under Conditions of Stable Prices and Salary" based on a projection of income of $9620 per year, Theodore's base salary in 1965, from age 44 through age 68, assuming no change in his salary level during the balance of his working days, giving no consideration to other income.

Before Marberry was permitted to state what would have been Mr. Schmitt's income during the balance of his working years as disclosed by this exhibit, defendants ob-

jected. Since this objection became a standing one to further questions to the witness and was the basis of objections to exhibits 13, 14 and 15, we set it out as summarized.

Grounds urged in the objection were: no proper foundation, no proper or sufficient qualification of the witness, the hypothetical question proposed included facts not in the record and ignored facts which were in the record, the question did not assume sufficient or adequate facts to support an opinion or answer which could have any probative value as to damages, the question did not limit the opinion as to the value of loss of decedent's services to his estate, called for an opinion or estimate of value of services which was purely speculative and conjectural, not a proper subject of expert testimony and called for an answer that would invade the province of the jury.

Defendants' objection was not sufficiently specific to advise the trial court why it was claimed the offered evidence was inadmissible and presents no question for review in this court. In addition to what we have said in Division XIII, supra, involving this question see McCrady v. Sino, 254 Iowa 856, 862–863, 118 N.W.2d 592, 595–596; In re Estate of Ronfeldt, Iowa, 152 N.W.2d 837, 846, and citations in these opinions which consider the objection "the question called for mere speculation and conjecture and not compétent to prove any issue in the case" and with counsel's duty in objecting to a hypothetical question. Nor does the objection alert the trial court to what sufficient or adequate facts the objector claims were omitted from the hypothetical question which would have had probative value on the issue of damages.

The complaints argued in two brief points under this assignment—the second, legal obligation of a parent to support a child in Iowa ceases at 18, or majority or when the child marries and the third, beneficiaries of a death action are only entitled to their actual loss and income taxes should be deducted from future earnings in ar-

riving at such loss—were not presented to or considered by the district court and defendants are not entitled to urge them here. See Castner v. Wright, supra, 256 Iowa at 652, 127 N.W.2d at 591 and Neibert v. Stone, 247 Iowa 366, 367–368, 73 N.W.2d 763, 764. This is also true of much of defendants' discontent with Marberry's testimony expressed in their written argument here. Accordingly, we decline to consider the complaints.

In exhibit 13 Marberry subtracted from the total of Theodore's projected income for the 25 years he would have continued to work the total of his projected personal expenditures of $1500 per year for the same period as shown by exhibit 9, the summary prepared by Judy, and arrived at a total present value of loss to the family of $141,-586. He observed this was not a proper figure to consider in light of today's economy, the trend and value of the dollar and wages in the United States.

Exhibit 14, another chart prepared by Marberry, was a summary of loss arising under conditions of increasing prices and salary. In this exhibit considering Theodore of average ability, looking only at his wage earnings and taking into consideration both inflation and increased productivity of economy, Marberry stated Schmitt would have received a total salary of $539,389 for the 25 years. Subtracting from this amount the projected total of Schmitt's personal expenditures Marberry arrived at the total loss to the family which he reduced to present value, $307,469.

Exhibit 15 was a graph showing the trend of Theodore's projected annual salary to 1989 which served as a basis for Marberry's opinion as to what Theodore's total salary would have been as shown in exhibit 14.

Defendants next contend Marberry's testimony should have been stricken on their motion made immediately following conclusion of his cross-examination on the grounds computations made were based upon improper considerations, improper records and did not consider present worth

of the estate deceased would have accumulated during his normal lifetime or proper items of damage for loss of support and services of the father to the family.

Our determination of the correctness of the court's ruling will be limited to consideration of these grounds since they were the only ones presented to the trial court. See 4 C.J.S. Appeal and Error, § 290bb, where it is stated, "In order to preserve any question for appellate review, a motion to strike evidence which has been erroneously admitted must specify the grounds or reasons for striking the evidence; and no reasons or grounds other than those urged in the trial below can be presented to the appellate court."

"It is * * * appropriate to point out that if any of the testimony to which the motion to strike was directed was competent, the motion * * * [was] properly denied. We have often held that a blanket motion to strike testimony, part of which is proper and part improper, should be overruled. * * * [Citing authorities]." Ferris v. Riley, 251 Iowa 400, 407, 101 N.W.2d 176, 180.

"The data on which an expert rests his specific opinion (as distinguished from facts which make him skillful to form one at all) may of course be fully inquired into upon cross-examination" 3 Wigmore on Evidence, Third Ed., section 992, since the probative value of an opinion depends upon the soundness of its foundation. Clark v. Lucas County Board of Review, 242 Iowa 80, 91, 44 N.W.2d 748, 754. See also Ipsen v. Ruess, 239 Iowa 1376, 1387, 35 N.W.2d 82, 90, and Dougherty v. Boyken, supra, Iowa, 155 N.W.2d at 495, which contain similar statements.

Defendants exercised this right to test and inquire into the basis of Marberry's opinion. They contend the cross-examination brought to light several factors Marberry failed to take into account in arriving at his loss of financial support figure and omission of these factors made his opinion highly inaccurate. Any fac-tors which Marberry allegedly failed to consider were matters for impeachment and argument and the court instructed (instruction 23) that any such impeachment was a proper matter to be considered in determining what weight, if any, should be given the opinion Marberry expressed. But the effect of defendants' cross-examination did not require Marberry's testimony be excluded in its entirety. District of Columbia v. Lot 813 in Square 568, (DC DC), 232 F.Supp. 714, 719–720.

This assignment of error is without merit.

XV. In the two remaining assignments defendants assert excessiveness of the verdicts as ground for new trial. They first contend the verdicts are so out of reason as to shock the conscience or sense of justice and raise a presumption they are the result of passion and prejudice and fail to administer substantial justice. In the alternative they argue there is lack of evidential support for the verdicts and a remittitur should be ordered.

In Henneman v. McCalla, supra, 260 Iowa at 80, 148 N.W.2d at 459, and again in Fetters v. City of Des Moines, 260 Iowa 490, 499, 149 N.W.2d 815, 821, we said:

It is not for us to invade the province of the jury. In fact a verdict will not be set aside or altered unless it is, (1) flagrantly excessive or inadequate; or (2) so out of reason as to shock the conscience or sense of justice; or (3) raises a presumption it is the result of passion, prejudice or other ulterior motive; or (4) is lacking in evidential support.

If the verdicts are the result of passion and prejudice a new trial should be granted, but if they are merely excessive because not supported by sufficient evidence even in the absence of passion and prejudice justice may be effectuated by ordering a remittitur of the excess as a condition for avoiding a new trial. Castner v. Wright, supra, 256 Iowa at 657, 127 N.W.2d at 594; Oldsen v. Jarvis,

Iowa, 159 N.W.2d 431, 434; and special concurring opinion in Allen v. Lindeman, 259 Iowa 1384, 1399–1401, 148 N.W.2d 610, 620–621.

In considering defendants' contention the verdicts are so excessive as to shock the conscience and show passion and prejudice, we must take the evidence in the aspect most favorable to plaintiffs which it will reasonably bear. We must also give weight to the fact the trial court, with benefit of seeing and hearing the witnesses, observing the jury and having before it all incidents of the trial, did not see fit to interfere. Shover v. Iowa Lutheran Hospital, supra, 256 Iowa at 718, 107 N.W.2d at 92; Miller v. Young, Iowa, 168 N.W.2d 45, 52.

Defendants contend the evidence of six plaintiff-witnesses describing in some detail decedents' relationship with their children, labor performed by Dorothy for her family, services performed by both as parents, their work in scout and church organizations and interest in community affairs was introduced solely to show passion and prejudice.

A similar contention was rejected in Hamdorf v. Corrie, 251 Iowa 896, 907, 101 N.W.2d 836, 843.

We point out defendants did not urge objection to the admissibility of evidence elicited by plaintiffs' examination of Halbach, decedents' minister; Dr. E. K. Lowary, their family doctor who is also a county medical officer; Marcella Schmitt, Theodore's mother; or Margaret Anderson, a friend. When a neighbor, Martin Duffy, was asked by plaintiffs whether he had noticed any change in the Schmitt family since the parents' death, defendants objected on the ground it was immaterial and had no probative value to any issue. The objection urged to Elaine Scribbins' testimony has been discussed earlier in this opinion.

These are the witnesses whose testimony defendants maintain created the passion and prejudice on the part of the jury.

■ We recognize that notwithstanding counsel's failure to make a record which would authorize this court to reverse the judgment on appeal, the trial court in its consideration of a motion for new trial is not limited by the status of the record in this respect when it feels the verdict fails to administer substantial justice or it appears the jury has failed to respond truly to the real merits of the controversy. In addition to the grounds stated in rule 244, R.C.P., for granting a new trial, the trial court has the inherent right to grant another trial where substantial justice has not been effectuated. As supporting this see Hall v. City of West Des Moines, 245 Iowa 458, 463–465, 62 N.W.2d 734, 737–738; Haase v. Hub-Co Credit Union, 253 Iowa 1202, 1204–1205, 115 N.W.2d 880, 881–882; Coleman v. Brower Construction Co., 254 Iowa 724, 729–732, 119 N.W.2d 256, 259–260; In re Condemnation of Certain Land (Carroll County), 256 Iowa 380, 385, 127 N.W.2d 566, 569; Comer v. Burns, 255 Iowa 251, 259, 122 N.W.2d 305, 311 (analyzing Coleman v. Brower Construction Co.); and Schroedl v. McTague, 259 Iowa 627, 642, 145 N.W.2d 48, 57.

However, " * * * it is axiomatic that counsel for a party cannot sit idly by and not attempt to direct the attention of the trial court to a possible limitation or restriction on the use of evidence and then, after an unfavorable verdict, take advantage of an error which he could and should but did not call to the court's attention. Such inaction on counsel's part weighs heavily in evaluating the right to a new trial." Wilson v. Pennsylvania Railroad Co., 421 Pa. 419, 432, 219 A.2d 666, 674.

Some evidence given by these witnesses was hearsay, some was perhaps objectionable on other grounds, but none were called to the court's attention and defendants offer no reasonable excuse why timely objections were not urged. Testimony of these witnesses being thus received was proper for jury consideration on the issue of damages permitted under Code section 613.15. Evidence which would be ob-

jectionable if properly objected to will support an issue when admitted without objection. Punelli v. Punelli, 260 Iowa 549, 555, 149 N.W.2d 784, 788, and citations.

Rule 344(f), par. 3, R.C.P., provides: "In ruling upon motions for new trial the trial court has a broad but not unlimited discretion in determining whether the verdict effectuates substantial justice between the parties."

Subparagraph 4 of this rule states: "The court is slower to interfere with the grant of a new trial than with its denial." But this does not mean the trial court has no discretion to deny a new trial. Hahn v. Graham, 256 Iowa 713, 722, 128 N.W.2d 886, 891.

█ In the exercise of this discretion the court would be justified in considering the fact no timely objections were urged to the admission of the evidence, the fact a party cannot as a matter of right raise a question of law on a motion to set aside the verdict and grant a new trial which might have been raised before verdict, Oakes v. Peter Pan Bakers, Inc., 258 Iowa 447, 456, 138 N.W.2d 93, 99, 10 A.L.R.3d 247, and Linge v. Iowa State Highway Comm., supra, 260 Iowa at 1232, 150 N.W.2d at 646, and the possible probative value of the witnesses' testimony on the issue of damages.

█ From an examination of the entire record we cannot say it clearly appears trial court abused its discretion in denying defendants' motion for new trial on this ground.

This leaves for consideration the evidence supporting the verdicts.

█ XVI. The measure of damages in an action brought under Code section 613.15 permits as allowable items the following:

1. The present worth or value of the estate which decedent would reasonably be expected to have saved and accumulated as a result of his efforts between time of his death and end of his natural life, had he lived.

2. An award of interest on the reasonable funeral expenses of decedent for such length of time as it was prematurely incurred, not to exceed either the reasonable cost of the funeral for a person of decedent's social and financial standing or the amount claimed therefor.

3. Recovery for all elements of damages sustained by the wrongfully injured person from the time of injury until the date of his death including those elements of damages permitted by Fitzgerald v. Hale, 247 Iowa 1194, 78 N.W.2d 509.

4. The present worth of the value of the services and support which he presumably would have contributed to his wife and children, or both, but for his untimely death.

See Druker, The Question of Damages Resulting From Recent Legislative Changes, 15 Drake L. Rev. 107, 109 (1966).

As pointed out, there were separate recoveries for each estate.

Items 1, 2 and 4 were made applicable to the factual circumstances here by instructions 14 (Dorothy's estate) and 20 (Theodore's estate). The issue of the award for services rendered the family was in on paragraph, support in another. Inasmuch as decedents were killed outright elements of damages authorized under a proper factual circumstance in No. 3 above or services or support of a spouse are not involved.

The only objection taken to these two instructions was to paragraph 3 of instruction 14, previously discussed.

The parties had stipulated as to the fair and reasonable value of decedents' funeral expenses.

Our inquiry is thus limited to consideration of items 1 and 4.

Plaintiffs rely primarily on testimony of George Alexander who had been associated with the Farmers National Bank in Webster City for 50 years for evidence of the present worth of the estates either Dorothy or Theodore might reasonably be expected to accumulate as a result of her or his own efforts. The accumulated total of Theodore's estate at death was $25,536.40. There was a mortgage of $13,987.67 encumbering the home owned in joint tenancy by Theodore and his wife. Viewing the evidence in the light most favorable to plaintiffs Dorothy's estate at death would probably not exceed one half of the equity in the home. However, based on his experience and acquaintance with the Schmitts he expressed the opinion that from his capabilities Theodore gave every indication of being able to accumulate a larger estate as years went by. He described both as generally thrifty with an ability to save money—frugal people.

The real conflict involves the jury's award to each estate for loss of parental services and support.

"In considering the size of verdicts we have repeatedly referred to passion and prejudice, shock the conscience, failure to administer substantial justice, the rule of fair compensation, and lack of support in the evidence. (Citations) It seems fundamental the most important of these is support in the evidence. If the verdict has support in the evidence the others will hardly arise, if it lacks support they may all arise. The real question in most cases, and here, is the amount and sufficiency of evidence to support the award made. Certainly where the verdict is within a reasonable range as indicated by the evidence the courts should not interfere with what is primarily a jury question." Mazur v. Grantham, 255 Iowa 1292, 1303, 125 N.W. 2d 807, 813–814. See also Mabrier v. A. M. Servicing Corporation of Raytown, Iowa, 161 N.W.2d 180, 183; Wilson v. Jefferson Transportation Co., Iowa, 163 N.W.2d 367, 374; and Miller v. Young, Iowa, 168 N.W.2d 45, 53.

We first consider the alleged loss of financial support to the six children due to the death of each parent.

As pointed out in Division XII, supra, the physical work Dorothy performed as household chores had a pecuniary value because one can either offer those labors in the labor market or presumably find a housekeeper to perform them. While Dorothy washed, ironed, cooked, sewed, cared for the garden, helped her husband paint the home interior and did the housecleaning, less sums were drawn from the family budget. We determined this constituted financial support to the family. Her ability to pursue her work had been destroyed by defendants' negligence and there was evidence from which the jury could determine the value thereof.

"* * * The value of the services of a housewife cannot be quantitatively measured in terms of money. Such services are in a different category than compensated employment; yet no one will claim that such services are not valuable. They should be recognized in the realm of law as in the domain of economics. Pain and suffering, likewise, cannot be definitely or adequately measured in dollars and cents, but this fact does not preclude an injured person from recovering for these elements of damages." Glanville v. Chicago, R. I. & P. R. Co., 196 Iowa 456, 463, 193 N.W. 548, 551. Citing Bridenstine v. Iowa City Elec. R. Co., supra. See also Rulison v. Victor X-Ray Corporation, 207 Iowa 895, 904–905, 223 N.W. 745, 749–750 and Note, Damages in Iowa—Loss of Time and Impairment of Future Earning Capacity, 12 Drake L. Rev. 59, 67–69 (1962).

In light of this pronouncement and those contained in authorities cited in Divisions XII and XIII, supra, there is substantial competent evidence reasonably tending to support an award of this element of damages in Dorothy's case.

Marberry's projection of Theodore's income based exclusively on salary from his

age at death through age 68 was offered as an aid to the jury in showing the economic loss to the family as a result of Theodore's being unable to produce the income from this particular. See Division XIV, supra.

In Von Tersch v. Ahrendsen, 251 Iowa 115, 120–121, 99 N.W.2d 287, 290–291, 79 A.L.R.2d 267, in considering similar testimony of the head of the mathematics department at Westmar College, we said:

"* * * [T]his evidence is admissible * * * to aid the jury in making their determination of the sum to be awarded plaintiff as the present value of the loss or impairment of future general earning capacity occasioned by permanent injuries, if any. And is to be taken into consideration, by the jury, with all of the other facts and circumstances bearing thereon shown in the evidence in making their determination."

In addition to the citations in this opinion see Har-Pen Truck Lines, Inc. v. Mills (5 Cir.), 378 F.2d 705, 710–713, particularly Division IV thereof where the court considers the testimony of an economics professor who testified as an expert on the value of the life of a hypothetical housewife in decedent's position there, had she lived. In rejecting defendant's contention the evidence was insufficient to support the jury's award of $100,000 for the wrongful death of the housewife the court noted in passing upon the admissibility of this type of testimony that "[s]uch modern scientific testimony is more reliable than the jury's unbounded musings of yesteryears", and in a footnote to this quotation further observed, "Academicians are not anathema to the judicial process, and use of such expert testimony is not uncommon in actions for the wrongful death of a wife and mother: Lithgow v. Hamilton, Fla.S.Ct. 1954, 69 So. 2d 776 (owner of domestic employment agency); Curnow v. West View Park Co., W.D.Pa., 1963, 220 F.Supp. 367 (family relations expert); Legare v. United States, S.D.Fla. 1961, 195 F.Supp. 557 (professor of economics), Merrill v. United Air Lines, S.D.N.Y. 1959, 177 F.Supp. 704 (home economist)."

Defendants offered no testimony in rebuttal of Dr. Marberry's.

Aided by Marberry's testimony and the estimate of Theodore's work expectancy and description given of his characteristics, habits, industriousness, disposition to earn, manner of living and sobriety, there was substantial evidence from which a jury might properly determine what part of his income from salary Theodore would have contributed to the financial support of his children, had he lived—a proper measure on this element of damages.

We consider next the issue of damages sustained by the children as the result of loss of services of Dorothy and Theodore as parents. The amount awarded to pay a housekeeper to provide physical labors performed by Dorothy does not compensate for loss of her distinct services as a mother which no housekeeper can supply. There is evidence she gave much time and thought to their training, kept in close touch with the school, aided as a girl scout leader and added to their religious instructions. Her services were furnished with "incessant activity, tireless energy, and never-flagging concern". See Spangler v. Helm's New York-Pittsburgh Motor Exp., 396 Pa. 482, 485, 153 A.2d 490, 492, where the court said in quoting from an earlier Pennsylvania case:

"The frugality, industry, usefulness, attention, and tender solicitude of * * * the mother of children, surely make her services greater than those of an ordinary servant, and therefore worth more. These elements are not to be excluded from the consideration of a jury in making a mere money estimate of value."

Theodore served as a boy scout master, was an accomplished camper, enjoyed camping trips with his sons and was constantly concerned about all the children's progress and behavior in school. When they came

to him with a problem, he gave them his attention in an effort to help.

Both parents gave unstintingly of their time and efforts to the training of their family, preferred to have them along rather than in the care of a babysitter and were described by their friends and acquaintances as ideal parents.

Section 613.15 permits recovery for the value of services decedents might and would have rendered in training and educating their children.

It is always difficult to estimate in money the value of such services, particularly where the type of service is not of a specialized character and is within the common knowledge of the average man who is cognizant of what the services are worth.

■ There is no mathematical rule or formula by which damages in this class of cases must or should be computed by courts or juries, and juries may draw inferences from the material matters shown by the evidence and thereby arrive at reasonably and approximately the correct amount of damages in cases where computation of such damages is practically incapable of proof by direct evidence. Evidence capable of exact mathematical computation is not required. Nicholson v. City of Des Moines, supra, 246 Iowa at 327, 67 N.W.2d at 538.

The jury had before it substantial evidence bearing on three elements for which recovery is permitted under this statute in determining their verdict. The question is, What amount will adequately compensate for the losses suffered?

In our determination whether the verdicts are excessive we give consideration to length of time such losses may be sustained.

From evidence of decedents' characters and dispositions the jury might properly find the children could expect these services to continue, had their parents lived.

Parental affection for the children probably will not cease after minority and the father may still continue to contribute to his children's support. That is a question for the jury to decide according to the evidence of the assurance the parental affection may give aid and support to the child after maturity.

■■ The jury in considering loss to the children by their parents' deaths is not limited to the time during which they are minors if it can conclude from the evidence such services would have continued after they attained majority. There is no such limitation in the statute, The Question of Damages Resulting From Recent Legislative Changes, supra, 114, nor is there any such limitation in the value of the mother's services or a father's protection to their children at the critical period of their lives when they are about to enter into more or less distinct and separate lives upon attaining their maturity. Damages are not restricted to loss of benefits to which plaintiffs have a legal right. Dahl v. North American Creameries, N.D., 61 N.W.2d 916, 923.

The author of the article in the Drake Law Review cited supra suggests "the time element involved in the * * * [fourth item—services and support] would be from the date of the decedent's death until the termination of his normal expectancy or the expectancy of his wife, whichever might be the shorter, plus in the case of children until such time as they might no longer need the decedent's support and services."

Other jurisdictions which have considered the question of duration of a child's loss of services suffered as a result of his parents' deaths have held the jury is not limited in fixing the award to the period the child is a minor. Strahan v. Webb, 231 Ark. 426, 435, 330 S.W.2d 291, 297; Burke v. City and County of San Francisco, 111 Cal.App.2d 314, 324, 244 P.2d 708, 715; Viosca v. Touro Infirmary, La.App., 170 So.2d 222, 225–226; Quam v. Wengert, N.D., 86 N.W.2d 741, 750; Connie's Prescription Shop v. McCann, Okl., 316 P.2d 823, 824–825; and Texas Consolidated

Transportation Co. v. Eubanks, Tex.Civ. App., 340 S.W.2d 830, 835.

Of course cases involving state or federal statutes containing a limitation are of no assistance here.

The Schmitt children had a right to look forward to care, advice and counsel from Dorothy for the remaining 33.97 years of normal life expectancy and from Theodore for 28.67 years. Even adult and married children have the right to expect the benefit of good parental advice and guidance.

Our statute permits the jury to include in its award the value of support as a parent and contains no limitation as to time element during which a child has the right to expect financial aid. "In the absence of a statute limiting the recovery of a minor child for the death of his parent to pecuniary loss during minority, a child may recover for the loss of pecuniary benefits which he might reasonably have expected after majority, * * * since damages are not restricted to such loss of benefits to which the infant had a legal right." 25A C.J.S. Death § 101(6), citing Dahl v. North American Creameries, supra.

Under the statute the surviving children are given rights to recover damages sustained from loss of support. The element of dependency is not involved in this statute, pecuniary loss is. Beck v. Groe, 245 Minn. 28, 34, 70 N.W.2d 886, 892, 52 A.L.R. 2d 875, 883.

Having once decided with the help of exhibit 14 showing a year-by-year computation of the present value of loss resulting from destruction of Theodore's income, the part thereof he would have contributed to the financial support of his children, the jury was then in a position to determine in arriving at its award the extent of time the children might reasonably have expected such contribution to continue, taking into consideration his work expectancy period to age 68. This was the age used by Marberry in exhibit 14 and was not contradicted.

█ In fixing present value of loss of financial support contributed by Dorothy's physical labor, her age and general health were proper matters for jury consideration.

Because of the factual distinction between this case and DeMoss v. Walker, 242 Iowa 911, 48 N.W.2d 811, nothing said there conflicts with the views expressed here.

The fact a parent may not be liable for support of his or her adult children is not determinative of the question here—length of time loss of support would be suffered by the Schmitt children. It is not uncommon for parents to give financial assistance to their married children or help support a single child after his majority.

It was a fact question for the jury to determine from all the evidence whether and how long these children even after majority might reasonably expect such financial support from their parents.

It should not be forgotten that determination of amount of damages, particularly in actions of this nature, is primarily and peculiarly within the province of the jury, under proper instructions, and courts should be and are reluctant to interfere with the conclusion of the jury when fairly made.

Courts are aware and take cognizance of the fact that the purchasing power of money changes from time to time, Jackson v. Chicago, M. St. P. & P. R. Co., 238 Iowa 1253, 1268, 30 N.W.2d 97, 105, jurors are no doubt conscious of this same phenomena.

As bearing on the question of excessiveness comparison of verdicts awarded in death damages under this statute with those rendered under factual situations not covered by it is no help. This was attempted by the author of the article appearing in the Drake Law Review cited supra.

█ We are unable to say the verdicts do not have evidential support.

All matters presented have been considered. Finding no error the trial court is

Affirmed.

MOORE, RAWLINGS and BECKER, JJ., concur.

LeGRAND, J., takes no part.

STUART, J., GARFIELD, C. J., LARSON and SNELL, JJ., dissent from Divisions XI and subsequent divisions.

All Justices concur in the first ten divisions of this opinion. As to Divisions XI and subsequent divisions, the Court is evenly divided and, therefore, the matter is affirmed by operation of law. (Section 684.10, Code, 1966).

STUART, Justice (dissenting).

I concur in the first ten divisions of the majority opinion, but respectfully dissent from division XI and subsequent divisions which approve the award of $264,162.24 for the death of Mrs. Schmitt and $302,577.94 for the death of Mr. Schmitt. The awards here are not realistic, are not supported by the evidence and did not effectuate substantial justice. I would therefore reverse and remand the case for new trial on the issue of damages alone. Without doubt Mr. and Mrs. Schmitt were fine citizens and excellent parents and their deaths were a terrible tragedy. The psychological impact of their loss upon these children is immeasurable. If the question were how much were these parents worth to these children, it would be impossible to quarrel with the verdicts. However, I do not believe the amendment to section 613.15 was intended to allow the jury free speculation in this area. The verdicts should have some relationship to the financial losses sustained by the children. If these awards were invested at 5%, they would provide the children with an annual income of over $28,000 without disturbing the principal of $566,000. Such result appears to

me to be totally unrealistic and unsupported.

Prior to the amendment to section 613.15 by the 61st General Assembly, the measure of damages for the wrongful death of a man under our survival statute was limited to the loss to his estate. This was grossly unfair to the family for whom there was no recovery for the loss of his support and services. The cost of supporting and educating a family make it impossible for the average father to accumulate a sizeable estate. The amendment sought to remedy this situation by making the measure of damages in this respect the same for a man and a woman. The only change in the measure of damages for the wrongful death of a woman was to add "loss of support" to "loss of services". The change is immaterial in so far as Mrs. Schmitt is concerned as her contribution consisted of services, not support. She did not work outside the home.

I. I shall first consider the award for Mrs. Schmitt's death. The evidence supporting the award is set forth in the majority opinion and need not be repeated here. In my opinion, the court erred in permitting Mrs. Scribbins to testify as to the value of Mrs. Schmitt's services as a "governess-manager". Plaintiffs failed to lay an adequate foundation for her opinion. Nothing in her education or experience qualified her to put a dollar value on such services. Attorney for plaintiffs conceded such foundation might not have been adequate in the first instance and, at the court's suggestion, proceeded to ask further questions. Most of the further questions dealt with qualifications to testify as to her value as a housekeeper. The only question directed to her knowledge of the cost of a governess was answered in the negative. She virtually admitted her lack of qualifications in her own narrative answers.

In Bridenstine v. Iowa City Electric Railway Co., 181 Iowa 1124, 1134, 165 N.W. 435, 439, we stated that the services of a mother cannot be weighed monetarily

and that it is almost frivolous to call witnesses to estimate the monetary loss. Although this statement was made in support of a verdict claimed to be too large, it seems equally applicable to any attempt to place monetary values on motherly services.

The verdict of $264,000 indicates that the jury made no attempt to reduce the value of her services to their present value. The services described and relied on were primarily enjoyed by minor children in the home. As children mature and leave the home the necessity for and the rendering of such services decrease. Even accepting Mrs. Scribbins' valuation of $15,600 per year for Mrs. Schmitt's services and allowing the full amount until the youngest child (5) reached the age of 21, the total would be less than $250,000. There is no evidence to support an award of $264,000 as the present value of Mrs. Schmitt's services.

In this connection we have said "the law implies damages to minor children but adult children must prove their pecuniary loss. 25 C.J.S. Death § 118. In such cases adult children are not entitled to recover on the basis of their relationship alone." DeMoss v. Walker, 242 Iowa 911, 913–914, 48 N.W.2d 811, 813.

The award here is ten times greater than any award previously approved by this court for the death of a mother. We approved an award of $23,620 in Henneman v. McCalla, 260 Iowa 60, 80, 148 N.W.2d 447, 459. There the wife helped with the farm work and earned $130 per month as a nurses' aid.

In my opinion the award is not supported by substantial evidence.

II. I also believe the award to the adminstrator of Mr. Schmitt's estate is not supported by the evidence, is the result of passion and prejudice and that a new trial on this issue is necessary in order to administer substantial justice.

I agree with the majority that proper objection to the foundation for Dr. Marberry's projections was not made and the evidence is in the record for whatever it is worth. However, I do not believe this evidence gives substantial support to the verdict.

I do not disapprove of the use of projected income and personal expenses to arrive at an estimate of the loss of support or loss to the estate, but, in my opinion, the foundational assumptions upon which Dr. Marberry based his estimate were so patently false and inaccurate that the evidence offered here was of little value and did not support his opinion.

Dr. Marberry prepared a schedule which showed that if Mr. Schmitt stayed in the same job until he was 68 years old, his salary would advance from $9600 to $32,319, increasing at the rate of 7% per year until he reached the median salary at age 57, then increasing at the rate of 4% per year because of inflationary pressures to age 65, where it would remain for the last three years. I believe there was adequate foundation for the opinion that inflation would cause a 4% increase in salary per year in this particular position. However, there was nothing to justify the assumption that Mr. Schmitt's salary would increase at the rate of 7% per year until the median were reached. There is nothing in the record which would entitle him to assume Webster City would ever pay the median salary or that Mr. Schmitt would ever reach the median salary. More importantly however the reason given for assuming the 7% rate was the increase in Mr. Schmitt's salary from $9000 in 1964 to $9600 in 1965. This was about a 7% increase which Dr. Marberry applied every year thereafter until age 57. He failed to consider that Mr. Schmitt's position had carried a salary of $9000 from July 1962 through 1964. The raise covered 2½ years not 1 year, and the actual rate of increase was less than the 4% inflationary rate.

Mr. Schmitt's daughter prepared a summary of all of his checks for the years 1963 and 1964. From this exhibit and her personal knowledge, she estimated her father spent $1500 a year for his personal expenses. I do not quarrel with the foundation for this opinion. However, Dr. Marberry assumed that Mr. Schmitt, who spent $1500 a year for himself when he was supporting 6 minor children on a salary of $9000 would spend the same dollar amount on himself as the children left home and his salary increased to $32,319. He gave no basis for this assumption. The mere statement of the assumption discloses its absurdity and unsoundness.

The $1500 per year personal expenses were increased to cover inflation at the rate of 2% per year. Although Dr. Marberry testified this was the rate of increase over a long period of time, the rate of inflation for the preceeding year was 3.3% and it was expected to exceed 4% in the year of the trial. Under this evidence, the use of a 2% rate of increase was not reasonable, especially when he used a 4% inflationary increase in wages.

For each year to age 68, Dr. Marberry deducted the projected personal expenses from the projected salary and arrived at a figure he called "loss to the family". This figure is highly inaccurate and misleading. It totally disregards the substantial impact of federal and state income taxes. Even if we accept, for the purpose of argument, his computations and assumptions, his "loss to the family" figure would be too large by several thousand dollars every year.

For example, according to Dr. Marberry's schedule, Mr. Schmitt would have earned $32,319 in 1986 at the age of 65. The federal and state income taxes on such salary, if the rates remained the same, would be about $7800. Nowhere in the exhibit is this unpleasant fact of life acknowledged. This gross error in and of itself is sufficient to destroy the value of Dr Marberry's opinions and computations.

There are, however, other factors which also tend to destroy the reliability of Dr. Marberry's projection of "loss to the family." He ignores social security contributions. He gives no consideration to church contributions which exceeded 7% of Mr. Schmitt's income. Because of the important place religion had in his life, it is logical to assume his church contributions would have increased as his income increased resulting in a corresponding diminution of the money available to the family.

I am not willing to say that so misleading and inaccurate projection furnishes support for Dr. Marberry's conclusion that the present value of the "loss to the family" resulting from Mr. Schmitt's death was $307,469 even if no proper objection was made to the foundation. But, the similarity between the jury verdict of $302,577.94 and Dr. Marberry's projected figure gives every inclination that the jury relied heavily on this unsatisfactory evidence. I find no substantial evidence in the record to support verdicts of the size rendered here.

I would reverse and remand the case for new trial on the damage issue alone.

GARFIELD, C. J., and LARSON and SNELL, JJ., join in this dissent.

LARSON, Justice (dissenting).

I believe the verdict here unreasonable. Unreasonable verdicts may not stand. The size of this verdict and the rulings upon evidentiary matters by the trial court, as well as the court's instructions, make necessary a review of the generally-adopted rules found necessary to control the size of the jury verdict. In some jurisdictions the legislature by statute has limited the

size of the verdicts in the public interest, and in others the courts have adopted various devices for controlling their size. DeMoss v. Walker, 242 Iowa 911, 915, 48 N.W.2d 811, 813. This control has been accomplished primarily by developing the so-called "law of damages," but is more accurately named "principles governing the recovery of damages." 22 Am.Jur.2d, Damages, § 22. Therein it is stated: "These principles, often stated in terms of rules, are used during the trial to control the admission of evidence and, later, to charge the jury with the framework within which it must award damages. These principles are also used by the reviewing court to keep the actual damage awards within the bounds of reasonableness." As bearing thereon, see Johnson v. Scott, 258 Iowa 1267, 1271, 142 N.W.2d 460, 463, and 33 Missouri Law Review 462, 464.

Prior to the amendment to section 613.15 by the 61st General Assembly we had limited by such rules the measure of damages for the wrongful death of a man to the loss to his estate. The legislature by this amendment did not attempt to alter these rules and, of course, did not place limits upon the recovery. To liberalize or abandon our control of admissible evidence and care in giving proper instructions would in most every case result in awards outside the bounds of reasonableness.

In Schmitt v. Jenkins Truck Lines, Inc., 260 Iowa 556, 563, 149 N.W.2d 789, 793, we touched on this matter, pointing out in construing the legislative intent of the last amendment, Chapter 427, Laws of the 61st General Assembly, we consider the evil sought to be remedied and the object and purpose to be obtained by it. Here the right to recover for loss of services and support of the father as well as the mother was provided, and no attempt was made to change our rules of damages relating to such services.

In the past we have considered services of a mother and wife and have allowed only evidence of supporting contributions, not the value of services of the mother to the family, saying: "The best that can be done is to prove the facts and circumstances of the woman's life and service in these capacities, her age, health and strength, her expectancy of life, and all that may appear to enlighten the minds and aid the judgment of the jurors. * * *." Bridenstine v. Iowa City Elec. R. Co., 181 Iowa 1124, 1134, 165 N.W. 435, 439. It was there pointed out that "it would seem almost frivolous to call witnesses to estimate their (the services) monetary value." The same logic must now be applied to the services of a father in the home as distinguished from evidence of support. Both a good father and a good mother render invaluable services to the family which cannot be the subject of monetary fixation by comparisons and expert opinion. The jury, armed with the facts as to health, services rendered in the home, and the obligations assumed by the parent, is itself the valuation expert as to the damage suffered in such a loss.

I believe this court should not relax its rules of evidence to the extent done here, and I concur in Judge STUART'S dissent in this regard.

If such verdicts are allowed to stand, there will be no clear judicial control over such damages in Iowa and it will require positive legislation to limit their size. I do not think the court now has any sound basis upon which to justify such a radical change of our past "law of damages" regarding such matters. To affirm this case will result in many unreasonable verdicts, high cost of insurance, and no judicial control of such litigation, vital to the public interest.